THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONALD POPELY, Defendant-Appellant.

First District (3rd Division) No. 61122

Opinion filed March 4, 1976.

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and John T. Theis, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Defendant, Ronald Popely, was found guilty after a jury trial of the offense of attempt rape. The trial court entered judgment on this verdict and sentenced defendant to 2 to 6 years in the Illinois State Penitentiary. Defendant now appeals.

On appeal defendant makes the following contentions: (1) that the trial court erred in denying his motion to suppress evidence; (2) that defendant was not proven guilty of attempt rape beyond a reasonable doubt; (3) that comments in the prosecution's closing argument concerning defendant's failure to call a certain witness deprived defendant of his right to a fair trial; (4) that certain statements defendant made should not have been admitted into evidence when there was no showing that defendant was given his *Miranda* warnings; and (5) that the failure of the State in response to defendant's specific request in his discovery motion, to disclose a statement allegedly made by defendant, should have precluded the admission of the statement for any purpose.

We reverse and remand.

At the time of the incident, early May of 1973, the prosecutrix, Julie, was an 18-year-old college student who was seeking summer employment. She went to Fore Personnel at 7 West Madison Street where defendant worked as a counselor. There she was interviewed, filled out

an application and returned home. Subsequently, defendant's employer, John Andros, asked defendant to contact Julie to see if they could place her. Defendant then called Julie telling her of the possibility of a summer modeling job. At first the prosecutrix was not interested, but after speaking to her mother and boyfriend who told her not to be so shy, Julie changed her mind, called defendant back and set up an appointment for Saturday, May 19, 1973. Julie was told to bring a skirt, a casual outfit and a bathing suit.

When the prosecutrix arrived at Fore Personnel on May 19, defendant, another man and two girls were present. After she filled out an application card, defendant asked the prosecutrix to go into the men's bathroom to change into her bathing suit. As Julie changed into her bathing suit, she left her underwear panties on underneath her bathing suit bottom.

At this point Julie's testimony and that of defendant differ substantially. Julie testified that the defendant came into the washroom to take her measurements. Julie testified that defendant first measured her bust and conceded that defendant's hands touched her bust but that she did not say anything. Defendant then asked Julie to remove the bottom half of her bathing suit because the suit was baggy and he could not get an accurate measurement. Julie voluntarily lowered the lower half of her suit. While taking these measurements, defendant told Julie that the modeling business was very competitive and that she might have to go to bed with her employers to get jobs. Julie replied that she was not going to prostitute herself for a job and defendant then said she could have the job. Defendant then asked Julie if she would go to bed with him and when she replied in the negative, defendant said, "I'm going to rape you." Defendant turned off the light, pushed Julie against the wall and knocked her down. As Julie was fighting and screaming, defendant ripped her undergarment off with his hand. Defendant then put his hand over Julie's mouth and Julie bit him. He then put one hand across her chest and undid his pants with the other.

Julie struggled with the defendant for approximately 30 seconds, until someone came in or knocked on the door. The defendant then got up, pulled up his pants, turned on the light and exited. Julie then dressed and picked up the two pieces into which her panties were torn and put them into her briefcase. As Julie was leaving, she walked into the office area where she saw defendant and another man. The defendant took one section of the panties from Julie's case and told her that she would not be able to prosecute him because she would have no evidence. After seeing the defendant burn that section of the panties, Julie left the office.

Julie then attempted to call her boyfriend and received no answer.

She went home on the rapid transit train and on the train she began to menstruate. Arriving home, she again called her boyfriend who took her to the train station where she called the police.

When the police arrived at the station she gave them the piece of undergarment she still had in her possession. The police officers took Julie to the hospital. Julie did not want to be medically examined because she had begun to menstruate.

Julie's boyfriend testified that he received a phone call from Julie at approximately 3 p.m. the day of the incident. She sounded hysterical and when he arrived at her house she was crying. He drove Julie to the train station where she again called the police.

Officer Pet testified that he and his partner met Julie at the train station and that Julie appeared emotionally shook up. After taking Julie to the hospital he received from her the section of the undergarment still in her possession. Officer Pet inventoried this section of the undergarment and sent it to the crime lab. He also recounted the story Julie told him. It was substantially consistent with hers except that Julie told Officer Pet that she refused to remove the bottom of her bathing suit.

Officer Bobko, one of the investigators assigned to the case, testified that he interviewed the prosecutrix the day following the incident. The prosecutrix told him that the defendant attempted to fondle her breasts and unbutton her halter top. After talking to the prosecutrix, Officer Bobko took handwriting examplars from her. He then proceeded to Fore Personnel where he found on the floor some charred material which he recovered and preserved. Officer Bobko further testified that it would not be normal procedure to examine the victim in an attempt rape case and that there never was an examination of Julie's body to detect any bruises. Officer Bobko also indicated that defendant surrendered voluntarily to the police the Tuesday after the incident and that when he saw defendant the following day he saw no bite marks on the defendant's hands.

The State's next three witnesses were all experts. One of these experts, a technician, testified that he removed certain charred material from the wastepaper basket, and from the floor in Fore Personnel and brought it to the evidence lab. Another of the experts testified that the burnt portion of panties recovered from the agency had fibers similar to the portion of panties recovered from the prosecutrix. Minute traces of blood were recovered from the panties but it could not be determined if the blood was from menstruation. There was no trace of semen on the panties. The third expert testified that it was her opinion that the handwriting on the papers secured from the agency was the same as that on the handwriting examplars taken from the prosecutrix.

Officer Jessie Jacobs, the State's next witness testified that he was present the Tuesday after the incident when defendant walked into the First District Police Station. Officer Jacobs testified that he told defendant that he was wanted for attempt rape and that defendant replied, "Oh, I thought that was what it was." Officer Jacobs further testified that defendant stated that the "broad" was mad because he would not hire her. Defendant then laughed and said that after he measured the prosecutrix he told her that she was not qualified.

John Andros, the owner of Fore Personnel, testified that it was not out of the ordinary for a girl being hired for a modeling job to have her measurements taken and that his office had no policy on these measurements being taken by a male. He further stated that there was no business procedure to burn the application card of someone who was unqualified.

Testifying in his own behalf, defendant stated that he arrived at Fore Personnel at about 9:30 a.m. on Saturday, May 13, and that he interviewed and tested his first client who left at about 10:30 a.m. During that morning a man named Flores, who had once worked for Fore Personnel but who was employed by another agency at the time of the incident, called and received permission from defendant to use Fore Personnel's office. Flores then came over with two applicants.

Defendant had one other interview, the interview with Julie, scheduled for Saturday, May 13. Julie arrived at the office Saturday afternoon, filled out the application card and had an interview with the defendant. Because the men's washroom was cleaner than the women's washroom, defendant asked Julie to step into the men's washroom to change into her bathing suit. When Julie came out of the washroom, Flores and the two girls were still in the office but were separated from the defendant and Julie by a partition which made it impossible for them to see each other.

Defendant asked Julie if she would be embarrassed if he took her measurements and Julie said no. After defendant measured Julie's waist, he measured her bust. His hands were right on Julie's bust, but Julie said nothing. In order to help defendant take the measurement, Julie unbuttoned and removed the top of her bathing suit. Julie, again unsolicited, removed the bottom half of her bathing suit. She was naked except for her panties. At this point defendant started discussing the modeling business with the applicant. He told her that it was very competitive and that she might have to sleep with her bosses, and be touched by salesmen and buyers. She asked if that meant she had to sleep with him, he said that would be all right. Defendant put his arms around Julie and kissed her. When she responded, he kissed her again

and put his hand into the leg band of her panties. Kissing Julie again, defendant moved his hand closer towards the vaginal area. Julie then suddenly jerked back and defendant was left with only a portion of the panties in his hand. The prosecutrix said, "I think this whole thing has gone too far." Defendant then told her to get dressed and returned to his desk feeling disgusted. He felt they had both gotten the wrong idea. Having the piece of panties and the application card in his hand, defendant lit up a cigarette and with the matches, burned the panties and card. Defendant put the charred remains of the panties and application card in the ashtray. Julie then exited the washroom and walked straight out of the office. There was no conversation. Because the charred remains of the application card and panties were giving off an odor, defendant emptied the ashtray into the wastebasket beside his desk and washed the ashtray in the washroom. Defendant never emptied the wastebasket.

On Monday defendant called his office and learned that there was a warrant out for his arrest. The following day, defendant voluntarily gave himself up to the police.

Defendant first contends that the trial court erred in denying his motion to suppress evidence. There is essentially no dispute as to the facts established at the hearing on the above motion. Officer Bobko testified that the day after the incident he went to Fore Personnel to see how it was architectually set up and in anticipation of getting a warrant. He was admitted to the building in which the office of Fore Personnel was located by a security man and accompanied by the security man up a hallway to the glass door entrance to the office of Fore Personnel. Officer Bobko then looked through the glass door and saw what he believed to be certain evidence which the prosecutrix had earlier described to him. As the officer leaned against the door, it opened and he walked inside. Inside the office, the officer recovered from the basin of the sink of the women's washroom bits of charred cloth and on the floor and in a wastebasket in an aisle between the desks pieces of charred paper with handwriting on them. The women's washroom was inside the agency and not accessible to a woman in the common corridor.

The defendant's testimony at the hearing on the motion to suppress established that defendant had a desk at the agency but not a private office, that he was never served with a search warrant, that he never gave permission to anyone to enter the office, that he was not arrested at the office but instead surrendered himself voluntarily to the police. After hearing all of the above evidence, the trial court, stating, *inter alia,* that defendant lacked standing to protest the warrantless search and seizure, denied the motion to suppress. It is our decision on appeal that

the trial court was correct in denying the motion to suppress and in finding that defendant lacked standing.

■■ Before a defendant can challenge the validity of a search and seizure he must establish the manner in which his constitutional rights have been violated. (*People v. McNeil* (1972), 53 Ill.2d 187, 290 N.E.2d 602.) The fourth amendment protects people and not simply areas and a person's fourth amendment rights are violated when a warrantless search conflicts with the person's reasonable expectations of privacy. (*People v. Nunn* (1973), 55 Ill.2d 344, 304 N.E.2d 81; *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507.) Considering the circumstances of the instant case, we do not find that the search was an unconstitutional invasion of defendant's privacy. The articles seized in the instant case were found on the floor of the office, in a wastebasket in an aisle between desks in the office and in the washbasin in the women's washroom inside the office. Furthermore, before the officer who seized the items entered the office, he saw certain of these items through the glass door to the office. The office itself was not reserved for defendant's exclusive use nor was defendant present when the search occurred. Considering the above factors, we do not find that the search was an unconstitutional invasion of defendant's right to privacy.

Furthermore, the facts in the instant case are clearly distinguishable from *Mancusi v. DeForte* (1968), 392 U.S. 364, 20 L. Ed. 2d 1154, 88 S. Ct. 2120, the case upon which defendant principally relies. In *Mancusi*, State officials without warrant seized certain union records from a union office shared by Frank DeForte and several other union officials. The United States Supreme Court held that DeForte had standing to object to the search of his office. In *Mancusi*, however, DeForte was present and had custody of the records at the moment of their seizure, facts clearly not present in the instant case.

■■ Defendant next argues that he was not proven guilty of attempt rape beyond a reasonable doubt. We disagree. The testimony of the complaining witness, even if contradicted by the accused, is alone sufficient to convict the accused if such testimony is positive. (*People v. Putney* (1971), 132 Ill. App. 2d 967, 271 N.E.2d 685; *People v. Stanley* (1974), 21 Ill. App. 3d 188, 315 N.E.2d 106.) Furthermore, the gist of attempt rape is the specific intent charged. (*People v. Marino* (1944), 388 Ill. 203, 57 N.E.2d 469; *People v. Cieslak* (1925), 319 Ill. 221, 149 N.E. 815.) In the instant case the prosecutrix testified that defendant told her he was going to rape her, knocked her down, got on top of her, undid his pants and ripped her underwear off. It was for the jury to determine intent. Furthermore, we find the testimony of the prosecutrix to be positive and very credible. This alone, without considering the

other evidence of the defendant's guilt, is sufficient to support the guilty verdict.

Defendant next objects to certain statements in the prosecution's closing argument concerning defendant's failure to call a witness by the name of Mark Flores. Mark Flores' name was first mentioned at a conference before trial and in the chambers of the trial court judge. At this conference, the defense told the trial court and the prosecution that there was a third party, Mark Flores, present in the employment agency during the incident and that defendant had been trying to locate this third party for a week. The defense then requested a continuance of several days in order to locate Mark Flores. The trial court indicated that if defendant selected a jury trial, he would have until jury selection was completed to locate the above witness. If defendant selected a bench trial, the trial court indicated that it would grant a continuance of several days to locate the above witness. Defendant selected a jury trial and, voir dire having been completed, trial commenced the next day.

At trial, Flores was first mentioned, although not by name, by the prosecutrix who testified during direct examination that there was another man present during the incident and it was this man who knocked on the door in reply to her screams for help.

On direct examination defendant testified that Flores was the man who had been present. At the close of direct examination he testified that he had last seen Flores a few days after the incident. Objection was sustained to his counsel's inquiry if he had been looking for Flores, but he was permitted to testify as to the unsuccessful efforts he had made to locate him. On cross-examination it was established that the defendant and Flores had worked at the same employment agency a couple of years previous to the incident; that during that time they had been friendly; and that in the intervening two years defendant had seen Flores socially twice. Defendant further testified on cross-examination that he did not presently know where Flores was or could be located and that he had not seen Flores since May of 1973.

The prosecution's comments on defendant's failure to call Flores as a witness were lengthy and occurred in both the State's opening close and rebuttal. The State initiated its argument in this regard by stating, "But let's get to the last clincher in this case * * *. Where is Flores?" The State then went on to argue that Flores was a good friend of the defendant, that defendant had invited Flores over to the agency the morning of the occurrence, and that any reasonable man in defendant's situation would guard Flores with his life because Flores was the only person who could corroborate his story.

Referring to defendant's statement that Flores had disappeared and that defendant had not seen him since, the prosecution argued:

> "Isn't that just great. The only guy that can corroborate the defendant's cock-in-bull story up here just disappears and now he can't find him. Well, how hard did he look? Did he say they sent investigators out to find this crucial witness? Didn't hear that. Did he look in the phone book to see whether this guy was listed? He didn't do anything.
>
> Now, let's see why. There is only one conclusion here, Ladies and Gentlemen. Why? Because if Flores came in here he'd tell the truth and the defendant didn't want Flores to come in here and tell the truth. He didn't want Flores in court, Ladies and Gentlemen, and that's the reason he didn't look for him. That's the reason he didn't find him and that's the reason Flores wasn't on that stand. Because Flores, Ladies and Gentlemen, would destroy the defendant's own story."

■■ The State initially argues that defendant did not object to any of the above allegedly prejudicial comments. While it is generally true that the assignment of error to allegedly prejudicial argument will not ordinarily be considered on review unless an objection was raised at the trial level, this rule has no application where the argument was so seriously prejudicial as to prevent defendant from receiving a fair trial. (*People v. Morgan* (1960), 20 Ill. 2d 437, 170 N.E.2d 529.) In the instant case, the presence of a third party at the scene was first mentioned by the prosecutrix on direct examination. Defendant testified later in the trial as to who this third party was, but in no way indicated that this third party would support his theory of the case. The day before trial the prosecution was informed that defendant was looking for and could not find Flores. Under these circumstances, the lengthy comments of the prosecution concerning defendant's failure to call Flores coupled with the prosecution's statement that Flores "would destroy defendant's own story" were so prejudicial as to deny defendant a fair trial. Even though, as we have held, the evidence presented at trial would sustain a verdict of guilty, defendant was entitled to have his guilt or innocence determined by the jury without prejudicial argument. *People v. Morgan* (1960), 20 Ill. 2d 437, 170 N.E.2d 529.

Defendant's final two contentions of error concern the testimony of Officer Jacobs who was present at the police station when defendant turned himself into the police. Officer Jacobs testified that he told defendant he was wanted for attempt rape and that defendant replied, "Oh, I thought that was what it was." Officer Jacobs then asked defendant if there was any basis for the charge and defendant replied there was not.

Defendant continued to converse with Officer Jacobs at which point Officer Jacobs told defendant that defendant was not required to say anything. Defendant, however, further told Officer Jacobs, "That broad's mad because I didn't hire her." Defendant went on to relate to Officer Jacobs that he told the prosecutrix that she might have to model and put on a bathing suit; that he would tell her if she was qualified after he took her measurements; and that after he took her measurements, defendant told her she was not qualified for the job.

■■ Defendant first contends that the above statements should not have been admitted when there was no showing that defendant was advised of his *Miranda* rights. We disagree. As stated in *People v. Thompson* (1971), 48 Ill. 2d 41, 45, 268 N.E.2d 369, 371, "The *Miranda* ruling thus applies only to statements actively and purposely elicited. 'By custodial interrogation, we mean questioning initiated by law enforcement officers * * *.' (384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.)" On the basis of Officer Jacob's testimony, we do not find that the above statements were actively or purposely elicited. Officer Jacobs told defendant he did not have to say anything but defendant continued to volunteer information. Under such circumstances the failure to give defendant his *Miranda* warnings did not preclude the admissibility of the above statements.

■■ Defendant further contends that the failure of the State to disclose the above statements allegedly made by the defendant, in response to defendant's specific request in his discovery motion, should have precluded the admission of the statements for any purpose. Considering the fact that we have already ruled that the cause should be reversed and remanded due to the prosecution's prejudicial closing argument and the fact that defendant is now well aware of Officer Jacobs' testimony, we see no reason for considering the above contention in this appeal.

For the foregoing reasons the judgment is reversed and the cause is remanded to the circuit court of Cook County for a new trial.

Judgment reversed; cause remanded.

MEJDA, P. J., and McNAMARA, J., concur.