THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CORNELL WRIGHT, Defendant-Appellant.

First District (1st Division)   No. 1—90—3108

Opinion filed December 14, 1992.—Rehearing denied June 3, 1993.

Michael J. Pelletier and Todd Avery Shanker, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan Schierl, and Andrea Bonin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Cornell Wright, was found guilty of attempted first degree murder, armed violence and aggravated battery and sentenced to a prison term of 15 years for attempted murder. On appeal, defendant contends that: (1) the prosecutor made improper remarks during closing argument which denied his right to a fair trial; and (2) the trial court considered improper factors in sentencing him to a term of 15 years' imprisonment. For the following reasons, we affirm the judgment of the trial court.

The following facts were adduced at trial. Terry Allen testified that on July 24, 1989, he lived on the first floor of a two-flat building at 1700 N. Mayfield, Chicago, with his wife and three children. Terry's parents and two sisters, Bridgette and Pamela, lived in the upstairs apartment, and his brother, Willie, lived in the basement.

Terry worked at a glass factory that day until 5:30 p.m., arriving home at approximately 6:15 p.m. At that time, his three sons were playing outside in the grass on the side of his house, and his wife was sitting on the back porch. Terry's friend Dwight Sparks was also present, as well as his sister Pamela and her one-year-old daughter Danielle. Terry went inside to eat dinner, and during that time, Sparks left. Terry did not change out of his work clothes, a blue coverall outfit.

Terry finished dinner at about 6:30 and went back outside. At that time, Terry heard Denardo Barnes and approximately 10 to 12 other people playing basketball in the alley behind Terry's house. Terry did not join them, but instead, played frisbee with his sons.

Soon Terry heard an argument in the alley. He recognized Barnes' voice, and then heard defendant say that he "didn't want them feeling on his girl friend's ass." Terry did not know defendant at that time. Terry then heard Barnes call defendant a "punk motherfucker," and heard more arguing back and forth. He heard defendant walk out of the alley saying he would be back. Terry first saw defendant when defendant came out of the alley and walked west on Wabansia. At that time, defendant was with a girl, and she was pushing a baby carriage.

Terry remained outside, playing with his sons. Terry then saw his friends Wayne Chapman and Maverick Rush walking toward him, west on Wabansia. Rush walked up to the side entrance of the house and stopped to talk to Terry's wife, Doris Denise. Chapman was walking toward Terry when Jimmy Hall and defendant drove up Terry's driveway in Hall's car, looked around, and then backed down the street. Hall parked the car on the corner of Mayfield and Wabansia, right at the side of Terry's home. Hall is Terry's brother-in-law.

Hall, defendant and Warren Barfield got out of the car and walked over to Terry. Terry turned to talk to Hall and asked him what he was doing there. At that point, defendant approached Terry, standing on his right. Terry told Hall not to start a fight and then defendant became angry and said to Terry, "What? Punk motherfucker, I'll pop you." Terry then turned to defendant and said, "Well, I wasn't even talking to you," and then turned back to Hall. Defendant then reached into his pocket, pulled out a gun, and fired a shot at Terry. The shot did not hit Terry, but went under his arm, brushing his shirt and landing in the bushes. Terry turned around to run, then heard another gunshot and felt something in his back. Terry fell to the ground, and after he fell, he heard three more shots. As Terry was lying on

the ground, he saw defendant, Hall and Chapman run to their car, get in and back down the street.

An ambulance arrived and Terry was taken to the hospital. He was operated on to remove his spleen, part of his pancreas, and one of his kidneys. Terry remained in the hospital for 30 days following his operation and was not able to go back to work for three months. Following his release, Terry had to return to the hospital regularly for therapy.

Next, Maverick Rush testified on behalf of the State, corroborating Terry's testimony. Rush stated that he and his co-worker, Chapman, arrived at Terry's house close to 7 p.m. He heard three shots fired and then saw Terry rolling around on the ground. Rush did not see who fired the three shots, because his view was blocked from where he was standing, but afterward, he saw defendant running toward the car with a gun in his hand. As defendant ran toward the car, he continued shooting. After the car drove away, he saw that Terry was lying on the grass holding his side. Rush went over to Terry and noticed that he was wounded. Rush never saw Terry or anyone else with a gun that day.

Pamela Allen, Terry's sister, then testified that at 7 p.m. on July 24 she and her daughter were sitting on the back porch of her second-floor apartment at 1700 N. Mayfield. They left the porch via the back stairs to go for a walk. She saw Doris Denise Allen talking to Rush and saw Terry playing frisbee with his children. Pamela talked to Doris Denise for a few minutes and then crossed the street with her daughter.

Pamela stated that defendant, Hall and Barfield pulled up to the side of 1700 N. Mayfield, got out of the car and walked towards Terry. Terry was talking to Hall and defendant cut in and said, "I will shoot your punk ass right now." Then defendant pulled out a gun and shot at Terry. When defendant fired the shot, Terry backed up and threw his hands into the air. Terry turned to run, and defendant shot him again, this time striking him. Pamela saw defendant continue to shoot as he ran to his car.

Pamela stated that during the incident, Terry never had anything in his hands and never reached into his pockets. During the incident, there were a lot of people in the alley playing basketball. Pamela did not see any of those people with guns in their hands, nor did she see any of them come out of the alley.

Jimmy Hall testified on behalf of the State. On July 24, 1989, Hall saw defendant at his cousin Warren Barfield's house. At that time, defendant stated that he and Denardo Barnes had been in an argu-

ment in the alley over defendant's girl friend, Sonja Short. Defendant told Hall that a group of guys was playing basketball in the alley and that one of them "felt on Sonja." Defendant asked Hall and Barfield to go over there with him to "get things straight."

Hall then drove defendant and Barfield over to 1700 N. Mayfield. They all got out of the car and Hall talked to Terry. Terry told Hall that they should not be out there starting trouble. At that time, they were standing by Hall's car, which was parked at the side of Terry's house. Terry then walked back toward his garage. At that time, Terry did not have anything in his hands.

Hall then saw Terry and defendant talking and although he could not hear what they were saying, an argument broke out. Hall saw defendant pull a gun out. Hall then heard shots fired and saw Terry turn sideways and start to run with his hands up above his shoulders. He did not know who fired the shots because he started to run to his car when he heard the shots fired.

Defendant got into Hall's car and they drove two blocks to Hall's sister's house. Once there, defendant changed into a pair of Hall's pants and Hall drove defendant to the "el" station. When Hall and defendant were in the car, defendant said that Terry made him mad enough to shoot him. At the time of the shooting, some guys were playing basketball in the alley, but Hall did not see anyone with a weapon.

On cross-examination, Hall stated that when he first saw defendant, defendant told him that people in the alley snatched a gold rope chain from around his neck, but Hall did not look to see if defendant was wearing a chain.

Wayne Chapman testified to the same essential facts, stating that he saw defendant pull a gun out of his right pocket and shoot at Terry. Chapman started running and saw defendant point his gun at Terry again. Chapman ran around the building. After the shooting, Chapman saw Terry lying on the ground. He did not see Terry reach into his pockets before defendant fired the shots, nor did he see Terry with a weapon at any time.

Denardo Barnes testified that on July 24, 1989, he was playing basketball in the vicinity of Mayfield and Wabansia with five other guys. Between 5:30 and 6 p.m., defendant and Sonja Short were passing through the alley. As they passed the group, the ball came close to them. Barnes grabbed the ball and Short flinched as if Barnes was going to hit her. Barnes grabbed Short and said, "Did you think I was going to hit you?" Then defendant stated to Barnes, "I will fuck you motherfuckers up." Following that, a couple of the other guys said

the same thing back to defendant, and defendant stormed angrily away, saying he would be back.

Barnes continued playing basketball, and after 10 or 15 minutes, he thought he heard Terry say that defendant was back. Barnes could not see Terry at that time, though, because Terry was in his driveway playing with his children. Barnes then heard defendant say, "Where is the pussy motherfucker Nardo?" When Barnes heard defendant, he started to walk out of the alley. He picked up the basketball to take one last shot and then heard three gunshots. Willie Allen ran through the alley and said that defendant had just shot Terry.

Barnes saw everyone gathering around the mouth of the alley, so he walked over and saw defendant getting into a car that was parked in front of Terry's house. The car then drove off in reverse down Wabansia. Barnes did not have a gun with him that day, nor did he see anyone else with a gun that day. Barnes did not notice whether defendant was wearing a gold chain at the time of the altercation.

Chicago police detective Roland Paulnitsky testified that he investigated the crime scene, and identified photographs showing a blood spot on the grassy parkway in front of Terry's house and bullet holes in the garage door.

The State presented the stipulated testimony of Dr. David Dries. Dr. Dries' stipulation stated that he treated Terry Allen on July 24, 1989, in the emergency room of Foster G. McGaw Hospital of Loyola University. He observed that Terry received a gunshot wound to his back, and performed surgery to remove Terry's spleen, kidney and a portion of his pancreas. X rays revealed the presence of a bullet in Terry's upper abdomen below his lower ribs. Terry was taken to the intensive care unit after the operation and remained there for nine days. After 30 days, Terry was released from the hospital. The State rested its case.

Sonja Short then testified on defendant's behalf. She stated that on July 24, 1989, defendant came to her house at around 5 p.m. Defendant and Short took her one-year-old baby and left Short's house to walk to the bus stop at Austin and Wabansia, cutting through the alley. When they reached the end of the alley, they encountered a group of guys playing basketball. At that point, Barnes touched Short's rear end and called her a bitch. Then defendant and Barnes started arguing. Soon the other guys joined in the argument. Short moved out of the way, taking the baby with her.

Short stated that the guys surrounded defendant. She saw one of the guys reach toward defendant and take his gold chain. Short

started to walk quickly toward Austin, and then defendant ran past her. She did not see defendant again that day.

On cross-examination, Short stated that she saw Terry standing by the bushes and that he was also playing basketball. After defendant ran off, she went to the corner of North and Austin and sat on a bench for about 20 minutes. Then she saw a lot of police and she returned to the scene.

Warren Barfield testified that on that day at about 3:30 p.m., defendant and Hall came over to his house and that defendant seemed very upset. After Barfield talked to defendant, the three men drove to Terry's house to try to get defendant's chain back. When they got there, Hall parked the car about a car length from Mayfield. Barfield stated that there was no driveway from Terry's garage leading onto Wabansia.

They got out of the car and Terry walked toward them saying, "Oh you brung your boys back." Terry called Barfield some names, and at that time defendant was a few paces behind Barfield. Barfield saw Barnes and Terry's brother, Willie, peeking around the corner, so he kept walking toward the alley.

Barfield saw Terry and defendant arguing, then heard Terry say to defendant, "Punk motherfucker, I will shoot you." Defendant then said, "Man, let's go. I just want my chain back." Then Terry lifted up his arm to about waist level and pulled out a gun. As Terry pulled his gun out, Barnes came out of the alley and started shooting. At that point, Barfield ran toward the car. When he got in the car, the shooting was still ongoing. Altogether, he heard five or six shots fired.

Defendant then testified on his own behalf that on July 24, 1989, he went to Short's house between 5 and 5:30. They left out of the back door with Short's baby and proceeded to walk down the alley behind Mayfield Street southbound toward Wabansia. They approached a group of people playing basketball. As they were passing, Short said, "Excuse me." Then Barnes bumped into Short, grabbed her rear end, and said, "Who are you bumping into?" Short replied, "I said excuse me," and Barnes responded, "Get out of my way, bitch."

Defendant then called Barnes a bitch, and they started an argument. They argued for 5 to 10 minutes, and during that time, Short took her baby and walked away from the crowd. As defendant was speaking to Barnes, the crowd gathered around him. Barnes said, "I have been waiting on you anyway." Defendant told Barnes, "So what," and they continued to argue. Then Barnes swung at defendant and hit him in the jaw. Defendant did not swing back. At that point, defendant's gold chain emerged from behind his jacket. Another guy

reached out of the crowd and yanked the chain off of defendant's neck.

Defendant then saw Barnes move his right hand as though he was going to show a gun. Defendant broke away from the crowd, running past Short and down Mason toward North Avenue. Defendant saw Terry in the alley.

Defendant ran to Barfield's house, where he found Barfield and Hall sitting on the porch. Defendant told Barfield and Hall about the guy who took his chain, and they got into Hall's car and drove to Terry's house. When they arrived, Hall pulled into an open parking space in front of the house. They all got out of the car and approached Terry. Terry turned around and yelled, "Jimmy and his bad boys," in the direction of the alley.

They approached Terry, who was standing alone. Terry walked to the middle of his driveway and stood in front of the garage. Defendant stood five to six feet from Terry. He waited to see if Hall was going to discuss the situation with Terry. At that time, the people in the alley stopped playing basketball.

Defendant watched Terry and Hall talk. Then defendant asked Terry if he told Hall where his chain was and where Barnes and the others had gone. Terry responded that he did not know what defendant was talking about and said, "You better get out of my face with that shit." Defendant then said, "Why did you have him jump on me, step up and make that comment?" Terry responded, "Get your young ass out of my face before I do something to you." Then Terry stepped backwards towards the garage.

Defendant then saw "an object like a gun" emerge from the bushes near the alley, pointed straight at him. Defendant saw Terry pull out a gun and aim it at defendant, and defendant saw a shot fired from the alley. Defendant then pulled a gun from his pocket, shot it and hit the garage. Defendant then started to run towards the car and he saw Terry spin around. Defendant saw Barfield run and proceeded to run after him. Defendant then fired the gun a second time toward the garage and ran toward the car. As he reached the car, defendant heard another shot fired. Defendant heard four shots fired altogether. Defendant stated that he had found the gun in a vacant lot earlier that day and intended to get rid of it, but did not.

The defense then entered the stipulated testimony of Chicago police detective John Boyle. Boyle stipulated that he interviewed Pamela Allen on July 24, 1989, after the incident. Pamela told Detective Boyle that she was on the rear porch of her house when she saw Jimmy Hall park his car on Wabansia. At that time, Hall was accom-

panied by a black male whom she recognized from the neighborhood. She heard the black male say, "[W]here's the mark?" Then she heard five shots and saw her brother, Terry, fall to the ground. The black male and Hall then fled.

The defense further entered the stipulated testimony of Jamie Aurieamma, an official court reporter. Aurieamma testified that she transcribed the proceedings of the preliminary hearing in this matter and that at that time Terry Allen testified that he did not see defendant fire the second shot. The defense then rested.

Detective Richard Curley then testified as a rebuttal witness for the State. Detective Curley stated that on July 26, 1989, Warren Barfield voluntarily came into the police station, and Detective Curley interviewed him. Detective Curley advised Barfield of his *Miranda* rights and Barfield stated that he understood his rights. Barfield then agreed to talk to Detective Curley about the incident. Barfield told Detective Curley that during the argument between Terry Allen and defendant, defendant suddenly, and without warning, pulled out a weapon and shot Terry two or three times.

Defendant then testified as a witness on his own behalf in surrebuttal. Defendant stated that after his arrest, he told Detective Curley that Terry Allen and some guys in the alley had guns and tried to fire at him. The defense then rested.

Each side presented closing arguments, and the jury returned a verdict of guilty. Following a hearing in aggravation and mitigation, defendant was sentenced to a prison term of 15 years. This timely appeal followed.

Initially, defendant contends that he was prejudiced by four areas of comments made by the prosecutor during closing argument and thereby denied a fair trial. The State asserts that seven of the nine comments about which defendant complains were not preserved as issues for review by either objection at trial or in defendant's written motion for a new trial and are therefore waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Nevertheless, we may address the prejudicial effect of those comments here. *People v. Williams* (1992), 228 Ill. App. 3d 981, 997, 593 N.E.2d 968.

In general, courts allow a great deal of latitude to the prosecution during closing and rebuttal arguments. (*People v. Williams* (1991), 147 Ill. 2d 173, 231, 588 N.E.2d 983; *People v. Smith* (1990), 199 Ill. App. 3d 839, 854, 557 N.E.2d 596.) When reviewing allegations of prosecutorial misconduct, the complained-of remarks must be considered in the context of the entire closing arguments of both the State and the defendant. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76,

514 N.E. 2d 970.) In closing argument, a prosecutor may comment on the evidence and legitimate inferences arising therefrom, and such comments do not exceed the bounds of proper argument. (*People v. Williams*, 147 Ill. 2d at 231.) A defendant may not claim prejudice from comments by the prosecutor when those comments were invited by defendant's argument. *People v. Richardson* (1988), 123 Ill. 2d 322, 356, 528 N.E.2d 612.

Defendant initially calls into question the following group of comments made during the State's closing rebuttal argument, arguing that the prosecutor's comments improperly shifted the burden of proof to the defendant:

> "And did you hear any evidence that any one of the other eyewitnesses told a different story that night than they did here today?
>
> * * *
>
> Have you heard any evidence, any evidence from that witness stand or from anywhere about why these people would all come in here and make this up, or any evidence at all about who started this whole frame-up?
>
> * * *
>
> PROSECUTOR: *** In addition, there is no physical evidence to support his story.
>
> DEFENSE: Objection, your Honor.
>
> PROSECUTOR: Have you heard—
>
> DEFENSE: The State has the burden. No physical evidence need support the defendant's story.
>
> THE COURT: Well, the jury is going to decide what facts there are. That is their job. Go ahead.
>
> PROSECUTOR: Have you heard any evidence of any bullets found anywhere else but where the State's Witnesses said they went? If someone is shooting the other way, you heard the detective out there for over an hour, have you heard any evidence about any bullets found over there? He could have had an investigator go out and look if supposedly it happened as he said it did. There is no physical evidence supporting his story."

The record reveals that during closing argument, defense counsel stated: "If he can get people to come in and say things that help him, he would be more than happy to say that." Defense counsel also implied that defendant fired shots in self-defense:

> "[Defendant's] defense is that these men had guns. He went back to take some measures to try to get that chain back and

to talk to these guys with people who he knew and who knew them. And guns were fired at him and he fired in response."

Defendant relies on *People v. Tyson* (1985), 137 Ill. App. 3d 912, 485 N.E.2d 523, and *People v. Popely* (1976), 36 Ill. App. 3d 828, 345 N.E.2d 125, both of which are distinguishable from the present case on their facts. In *Tyson*, the court found that the prosecutor made a serious error when he insinuated in his closing statement that the defendant had a burden to present evidence to support his innocence. The prosecutor stated, "First of all, you have to have been presented in this case with a theory of innocence." (*Tyson*, 137 Ill. App. 3d at 920.) The court sustained defense counsel's objection to this comment and failed to admonish the jury to disregard the comment.

In *Popely*, in both closing argument and in rebuttal, the prosecutor repeatedly commented at length on defendant's failure to call a certain witness, concluding that the witness "would destroy defendant's own story." (*Popely*, 36 Ill. App. 3d at 836, 345 N.E.2d at 130.) The court noted that the defendant testified at trial as to who this third party was, but in no way indicated that this third party would support his theory of the case. The court also noted that the prosecution was aware prior to trial that the defendant was attempting to locate the witness, but could not find him. Under these circumstances, the court found that the prosecutor's comments were so seriously prejudicial as to prevent defendant from receiving a fair trial. *Popely*, 36 Ill. App. 3d at 836.

■ The record in the present case indicates that the above comments objected to by defendant were invited by defense counsel's closing argument. Here, the prosecutor neither intimated that the defendant had to present a theory of innocence nor commented that the defense failed to present a witness who would have destroyed defendant's case.

■ The second area of argument which defendant alleges was prejudicial involves the credibility of defense witnesses:

"PROSECUTOR: *** But if you are going to believe the defense theory of the case, all of those witnesses are lying.

Now let's see. When did they get together and make this story up? I guess it would have to be while Terry's lying there gunned down, bleeding from the back *** Here's what we're going to say. Let's all get this together so that when the trial comes up [defendant] won't be able to assert a self-defense theory.

* * *

You think that is what they did, ladies and gentlemen? You

think when Terry's lying there just shot that they are thinking about [defendant] trying to prevent a self-defense theory about making up all these lies? Of course not.

\* \* \*

But if you want to believe the defense theory, you have to believe that Terry wasn't their priority, that getting the story straight was their priority at that time."

Defendant argues that these comments misstate the law. Defendant's reliance on *People v. Cole* (1980), 80 Ill. App. 3d 1105, 400 N.E.2d 931, is unavailing, however, as the facts are not comparable. There, the prosecutor listed all of the witnesses by name, informing the jury that in order to believe the defense witnesses the jury must find that each of the State's witnesses was lying. The court found that such a statement was a misstatement of law. (*Cole*, 80 Ill. App. 3d at 1108, 400 N.E.2d at 933.) Defendant's further reliance on *People v. Davidson* (1992), 235 Ill. App. 3d 605, is similarly distinguishable. There, the prosecutor was found to have misstated the law when he told the jury that it would have to disbelieve all of the State's witnesses in order to find defendant not guilty. (*Davidson*, 235 Ill. App. 3d at 612.) The above comments do not rise to the level of the comments in either *Cole* or *Davidson*.

Regarding the third area of argument, defendant complains that the prosecution improperly injected personal opinion into its closing and rebuttal arguments. Defendant first complains of the following exchange:

"PROSECUTOR: \*\*\* And then he [defendant] tells you, and this is the most ridiculous thing I have heard throughout this trial—.

DEFENSE: Objection, your Honor, to what she considers ridiculous.

THE COURT: Overruled.

PROSECUTOR: —He tells you that Terry spins around after being shot at."

Generally, it is improper for a prosecutor to vouch for the credibility of a witness or to express a personal opinion on the issues. (*People v. Emerson* (1987), 122 Ill. 2d 411, 522 N.E.2d 1109; *Williams*, 228 Ill. App. 3d at 1001.) Fair comments on the evidence, or on legitimate inferences derived therefrom, are permitted, however. *People v. Johnson* (1987), 119 Ill. 2d 119, 518 N.E.2d 100; *Emerson*, 122 Ill. 2d at 434.

■ The record indicates that the prosecutor's comment was based on the testimony presented at trial, that Terry was shot in the

back and fell to the ground. Therefore, the comment was not an improper assertion of personal opinion based on facts not in evidence.

■ Defendant makes a similar objection to the following remark made later by the prosecutor:

> PROSECUTOR: *** And he [defendant] gets his buddy, Warren, to change his story too. *** Well, we know they're both lying. We know for a fact they both changed their stories."

Viewed in the context of the entire argument, the above comment was fair comment on the evidence. The record indicates that Barfield's testimony at trial differed from the story he told to Detective Curley on July 26, 1989. The prosecutor's comment, therefore, properly foreshadowed the jury instruction on the believability of the witnesses. See *Williams*, 228 Ill. App. 3d at 1001.

■ Finally, defendant complains of the following statements, arguing that the prosecutor's use of the word "I" indicated that he was expressing his own opinion:

> "PROSECUTOR: *** Now I don't want to believe that is a warning shot as the defendant alleges.
> * * *
> I am going to preface what I am going to say by telling you that Terry Allen has no motivation to come in here and lie to you."

In the present case, the prosecutor expressed opinions as to the proof offered against defendant, and these opinions were legitimate inferences based on the trial record. Error does not result every time a prosecutor uses sentences beginning with, *e.g.*, "I believe." *People v. Baker* (1990), 195 Ill. App. 3d 785, 788, 552 N.E.2d 421.

Regarding the fourth and final area of argument, defendant argues that comments by the prosecutor improperly bolstered the credibility of the State's witnesses. Defendant complains of the following exchange:

> "PROSECUTOR: She [Pamela Allen] told the police the same story when she talked to them the day of the shooting ***. They all went to the police station; Denardo Barnes, Wayne Chapman, and their stories all matched.
> DEFENSE: Objection your Honor. There is no evidence that they did.
> THE COURT: Well, the jury has heard the evidence. They will make that decision. Go ahead.
> PROSECUTOR: Two days after the shooting Jimmie Hall and Warren Barfield go into the police station. They tell the

same story as the other witnesses told. They saw the same thing happen.

When Terry Allen, the victim in the case was able to talk to the police, he told the same story, the same version of the events as everyone else saw.

\* \* \*

PROSECUTOR: \*\*\* [H]e [Jimmy Hall] came in here and he told you what he saw the same as he did to the police a year ago, the same story."

Defendant argues that the above statements were improper because the prosecutor referred to prior consistent statements by witnesses which were not adduced at trial. Defendant further argues that the comments were inconsistent with the evidence presented at trial.

■ The record indicates that Pamela Allen related the same facts to Officer Boyle on July 24, 1989, as she testified to at trial. As to the comments of the prosecutor regarding the credibility of the other State's witnesses, the record indicates that the jury could reasonably infer from the evidence that the witnesses' stories were consistent. The record does not reveal that any of the witnesses were impeached in their testimony by defense counsel.

Next, defendant contends that the trial court improperly considered his guilty verdicts for aggravated battery and armed violence in imposing his sentence for attempted murder. Defendant further argues that 15 years is an excessive sentence and should be reduced in light of his potential for rehabilitation.

The trial court's decisions regarding sentencing are given great weight and deference. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884; *People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344.) It is well established that the imposition of a sentence is a matter of judicial discretion and that absent an abuse of that discretion, the sentence as determined by the trial court should stand. *Perruquet*, 68 Ill. 2d at 153.

In sentencing a defendant, the trial court may consider the gravity and circumstances of the offense, as well as defendant's mental capacity, age, demeanor and credibility. (*E.g., Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.) Furthermore, the trial court must balance the objectives of protecting society and rehabilitating the defendant. (See *People v. Harris* (1989), 187 Ill. App. 3d 832, 844, 543 N.E.2d 859, 866.) A reviewing court will hesitate to upset this balance, especially where the sentence falls within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641, 649.

■ The record in this case indicates that defendant was sentenced to 15 years' imprisonment, which is well within the statutory guidelines for attempted murder. (See Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3) (attempted murder is punishable with a term of not less than 6 years and not more than 30 years).) The record indicates that the court considered that defendant was a high school graduate and was employed at the time of his arrest. The court further considered that defendant had no prior convictions and that he was progressing at the PACE Institute, an educational program at the Cook County jail. The court also considered the testimony of defendant's minister, Lamont Coakley, that defendant attended church services and tried to excel. In addition, the court considered that Terry Allen was seriously injured on his own property, and that defendant returned to Allen's property with two other men and a gun rather than calling the police. The trial court found that in light of the jury's verdict of guilty on all three counts, a sentence of 15 years for attempted murder was appropriate.

Defendant's reliance on *People v. Hurt* (1988), 175 Ill. App. 3d 970, 530 N.E.2d 698, is misplaced. There, the court found that the trial court improperly sentenced the defendant on all of the verdicts returned against him, and vacated three of the convictions that arose from the same physical act. (*Hurt*, 175 Ill. App. 3d at 981; see also *People v. Mack* (1984), 105 Ill. 2d 103, 137, 473 N.E.2d 880, 898.) In the present case, although the trial court considered all of the jury verdicts, defendant was only sentenced for attempted murder.

Accordingly, defendant has failed to show that the trial court erred in sentencing him to a prison term of 15 years.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

O'CONNOR and MANNING, JJ., concur.