THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
THOMAS CROWDER, Defendant-Appellant.

First District (1st Division)   No. 1—92—2721

Opinion filed December 13, 1993.

Rita A. Fry, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Kathleen Van Kampen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Thomas Crowder[1] was convicted of two counts of attempted murder, armed violence and aggravated battery on a public way, and sentenced to concurrent terms of 12 years on each count of attempted murder. On appeal, defendant contends that: (1) the trial court improperly admitted hearsay evidence at trial; (2) evidence of the victim's medical condition improperly aroused the sympathy of the jury; and (3) the prosecutor made improper remarks during rebuttal closing argument, thereby denying his right to a fair trial. For the following reasons, we affirm the judgment of the trial court.

The following facts are relevant to this appeal. On May 31, 1991, at approximately 11:15 a.m., Howard Ross and Michael Watts were shot as they walked west on Winchester Street, Chicago, Cook County, Illinois. Prior to trial, the State moved to exclude evidence that, at the time of trial, Ross was living at Madden Mental Health Institute. The trial court denied the State's motion, ruling that defense counsel was allowed to bring out evidence that Ross lived at Madden and was being treated for depression. The trial court stated that defense counsel could cross-examine Ross on any possible memory problems he might have had from the time of the incident to the day of his testimony.

At trial, Howard Ross testified that on May 30, 1991, he was living at 53rd Street and Honore Avenue with his mother, father, siblings, nieces and nephews. At that time, Ross worked at Ryan Temporary Services and attended the Cooking Hospitality Institute of Chicago. That night, Ross went out drinking with friends.

---

[1]The record indicates that defendant is also known as Anthony Crowder.

The next day, May 31, 1991, Ross' mother asked him to go to the hardware store. At approximately 11:15 a.m., Ross and his friend Michael Watts walked north on the east side of Winchester Avenue toward a hardware store located at 51st Street and Damen Avenue. Ross stated that it was a nice, warm, summer day. When they reached the middle of the block, they noticed three black young men sitting on a ground-level porch on the east side of the street. Two of the men appeared to be about 15 and 16 years old. Ross identified defendant in court as the third man sitting on the porch and stated that defendant was older than the other two and was wearing a white T-shirt, blue jeans and gym shoes.

As Ross and Watts walked past the three young men, one of them said "what are you doing walking down this street." At that time, Ross and Watts were about a house length away from the young men. Ross and Watts continued walking. Ross stated that, at one point, he just happened to turn around, and he saw the three men stand, and he saw defendant pull a shiny, silvery gun out of his pocket. Ross also saw that the other two young men had guns in their hands. Ross told Watts to run, and they both ran in an eastward direction, through a vacant lot approximately one house away from the house where defendant stood.

Defendant and the other two then descended the porch and ran after Ross and Watts. Ross heard about 15 to 20 shots fired. Ross was hit with a bullet in the back of his neck, and he fell to the ground. When Ross fell, he noticed that Watts had fallen also. Ross also saw defendant standing on the sidewalk, continuing to shoot at him and Watts. Ross then saw defendant reach into his pocket and reload his gun. Ross got up from the ground, grabbed Watts and told Watts to run. Ross looked back as he was running and saw defendant and the others leaving the scene. Ross ran ahead of Watts and noticed that Watts was shot just below his left buttock.

Ross and Watts ran to the home of a friend on Honore Avenue and told him to call the police. Ross was taken by ambulance to Mt. Sinai hospital, where he stayed for one night.

On June 2, 1991, Ross and Watts drove together south on Winchester Avenue and saw defendant and the other two young men standing on the same porch as on May 31. Ross and Watts drove to Watts' home and called the police. The police arrived, and Ross and Watts accompanied the police to Winchester Avenue, where they identified defendant and the others. The police apprehended all three men.

Ross stated that he last saw Watts about two weeks after the shooting. Ross' subsequent attempts to locate Watts were unsuccessful. Ross stated that since the time of the shooting, he has been

unemployed and that he has been living at the Madden Mental Health Institute since April 25, 1992. Ross stated that he signed himself into Madden because he was feeling depressed and suicidal. Ross stated that he attempted suicide about a month after the shooting.

On cross-examination, Ross admitted that he was treated for alcoholism three years prior to trial. He admitted that the night before the shooting, he drank about a half pint of gin and did not go to bed until 3 a.m. the following morning. Ross admitted that at a preliminary hearing he testified that defendant was running as he was reloading his gun.

On redirect examination, Ross stated that after he was shot and looked back to see defendant reloading his gun, he was approximately 80 to 100 feet away from defendant, or two house lengths away. At that time, nothing was obstructing Ross' view of defendant.

Dr. Amarjit Singh, an emergency room physician at Mt. Sinai Hospital, testified that on May 31, 1991, at approximately 12:42 p.m., he treated Ross for a through-and-through gunshot wound in the left posterior part of his neck. The parties stipulated to the testimony of Dr. Feldman, an emergency room physician at Holy Cross Hospital, who stated that on May 31, 1991, at approximately 12:30 p.m., he treated Watts for a through-and-through gunshot wound to the left buttock and leg.

Next, Chicago police officer David Trinidad testified on behalf of the State that on June 2, 1991, at about 6:15 p.m., he met Ross and Watts in the vicinity of 53rd and Honore. Trinidad stated that Ross had a patch on his neck and Watts was limping. Ross informed Officer Trinidad that he was shot two or three days prior to June 2, and that he had made a report for aggravated battery. Ross told Officer Trinidad that he was driving along 51st Street and Winchester on June 2, 1991, when he saw the three offenders who shot him. Trinidad and his partner took Ross and Watts to 51st Street and Winchester in the squad car. When they arrived, Ross and Watts identified defendant and the others. The three men scattered, but the officers apprehended all three men and arrested them.

On cross-examination, Officer Trinidad admitted that at the time defendant and the others were arrested and searched, none of them had a gun.

Josie Small, defendant's aunt, testified on defendant's behalf that at the time of the shooting, she lived next door to defendant at 5146 South Winchester Avenue. Small testified that on the morning of May 31, 1991, at approximately 12 p.m., she was sitting on her front porch when she heard shooting coming from the vacant lot across the

street, about four houses down from her house. At that time, she did not see anybody. After the shots were fired Small saw two men running away from the shooting. Small stated that she did not recognize the two men and that defendant was not one of them. Small then got up and went into her house. She then saw defendant looking out of the window of the house next door and he asked her what had happened. Small told defendant that she heard some gunshots, and then went into the house. Small stated that at that time, defendant wore his hair in a French braid and had a moustache as well as a goatee.

On cross-examination, Small stated that she did not call the police because she has no telephone. Small stated that defendant's mother asked her to testify at trial on defendant's behalf. Small stated that when she talked to defendant after the shooting, he wore no shirt.

Next, Gina Poindexter, also an aunt of defendant, testified on defendant's behalf. Poindexter stated that she lives four houses down from defendant on Winchester. On May 31, 1991, at approximately 10:30 a.m., Poindexter went to defendant's house to make a telephone call. Poindexter rang the doorbell, and defendant came to the window. Defendant threw the keys to the house out of the window, telling Poindexter that he did not feel like coming downstairs to let her into the house. Poindexter then unlocked the door and entered the house. When she got upstairs, defendant was lying on the floor in front of the television. Poindexter made a telephone call, and then left the house, locking the door behind her. Poindexter stated that defendant wore his hair braided to the back and that he had a moustache and a growth of hair on his chin.

At approximately 11:45, Poindexter returned to defendant's house to make another telephone call. She let herself in with the keys defendant gave to her. When she went upstairs to make the call, defendant was sleeping in front of the television. Poindexter made the call, and then returned home.

About 15 minutes later, she heard a gunshot. She went to her window, then heard about two more gunshots. Poindexter then looked out of her window to the vacant lot below and saw two men. One of the men was shooting a gun and the other one was standing behind him. She did not recognize the two men, nor did she see at whom they were shooting.

At approximately 12:20, the police came to Poindexter's house and asked her if she recognized the individuals who were in the lot. She told the police she did not recognize the men and allowed the police to search her home. The police did not find anyone in Poindexter's home.

On cross-examination, Poindexter testified that defendant and the other two men arrested on June 2, 1991, are her nephews. Poindexter admitted that prior to trial, she neglected to tell the prosecution that she had returned to defendant's house to make a second telephone call and that the police had come to the house on the day of the shooting, despite the fact that she had been asked to tell the prosecutors everything she knew about the shooting. Poindexter further admitted that even though she knew defendant was in custody, she never went to the police station to tell the police she had seen defendant in his house at 11:45 a.m. on May 31, 1991. Poindexter further stated that prior to trial, she told the prosecutors that the person standing behind the shooter was yelling, "shoot him, shoot him," and that the shooter was shooting toward one person. She also admitted that she had told prosecutors that she could see defendant's windows from her vantage point and that she was positive that the windows were closed.

Following closing arguments, the jury found defendant guilty of two counts of attempted first degree murder, two counts of aggravated battery on a public way, and two counts of armed violence. The trial court sentenced defendant to concurrent prison terms of 12 years for each attempted murder conviction, the other offenses having merged into the attempted murder convictions. Defendant's timely appeal followed.

Initially, defendant contends that the trial court improperly allowed Officer Trinidad to testify as to what Watts told him when the officers reached the scene of the shooting. Defendant cites the following testimony as improper hearsay because Watts did not testify at trial:

"PROSECUTOR: What happened when you arrived there?

TRINIDAD: As we arrived there was a few people on the block and as we were pulling up at 5137 South Winchester both of the victims blurted out those are the three guys who shot us."

The trial court sustained defense counsel's objection as to what Watts said, and ruled that Trinidad could testify as to what Mr. Ross had "blurted out." Subsequently, the following colloquy occurred:

"PROSECUTOR: When you say Mr. Ross blurted out those are the guys that shot us, had you asked him when you arrived at that location are those the three guys that shot you?

TRINIDAD: Yes. They positively identified the three subjects as the shooters.

THE COURT: Sustained as to what they did, but you may ask him as to what Ross was saying and what Ross did."

The State responds that defendant has waived this argument for

review for failure to both object during closing argument and raise the objection in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) The State argues that in his post-trial motion, defendant misstated the facts that occurred at trial and now alleges errors different from those defendant complained of in his post-trial motion. The State argues that defendant's post-trial motion objected to admission of the statements of Ross and Watts through the testimony of Ross. In support, the State cites paragraph 5 of defendant's post-trial motion:

"5. The Court improperly allowed police officer Trinidad to testify to the hearsay statements made by Howard Ross in the police car. Further the State was allowed to put into evidence Michael Watts [*sic*] identification of defendant *through the hearsay statements of Howard Ross.*" (Emphasis added.)

■ Defendant admits that the objectionable testimony was actually that of Officer Trinidad, but urges this court to take notice of this alleged error under the plain error doctrine. The plain error doctrine may be invoked in criminal cases to review an error which has not been properly preserved for review under two circumstances: (1) where the evidence is closely balanced; or (2) where the error is of such magnitude that the defendant was denied a fair trial. *People v. Young* (1989), 128 Ill. 2d 1, 46-47, 538 N.E.2d 453.

The record in the present case does not show that the evidence was closely balanced. The State presented the testimony of Howard Ross, an eyewitness, who identified defendant as the person who shot him. The record shows that the shooting occurred at 11:15 a.m. on a nice warm day in May 1991, and that Ross identified defendant to police two days later. Further, during trial, Ross made an in-court identification of defendant. Because of this strong eyewitness testimony, we do not find the evidence closely balanced. Neither does the record show that the alleged error was of the magnitude to have denied defendant a fair trial in light of Ross' positive eyewitness testimony.

Further, an out-of-court statement not offered for the truth of the matter asserted, but rather to illustrate the steps involved in the police investigation of a crime, is not hearsay. (*People v. McNeal* (1987), 160 Ill. App. 3d 796, 513 N.E.2d 897.) In the present case, the record shows that Officer Trinidad properly testified as to the events surrounding Ross' identification of defendant and defendant's subsequent arrest. In any event, the record indicates that any error was cured by the trial court's sustaining of defense counsel's objections.

Defendant counters that defense counsel's objections were

ineffectual because the prosecutor relied on Trinidad's objectionable testimony during her closing argument. Defendant cites as improper the following statement made by the prosecutor in closing argument:

"And they were able to identify this defendant as one of the shooters, as the person who tried to kill him, as the person who tried to killed [*sic*] Howard Ross and the person who tried to kill Mr. Watts."

Defendant argues that the prosecutor's statement was based exclusively on the testimony of Officer Trinidad as to what Watts said, which was explicitly prohibited by the trial court.

The record reveals that defendant failed to object to the prosecutor's statement both at trial and in his post-trial motion. Therefore defendant has waived review of this prosecutorial remark.

Even if the prosecutor's comment was erroneous, no new trial is required. In general, courts allow a great deal of latitude to the prosecution during closing and rebuttal arguments (*People v. Wright* (1992), 246 Ill. App. 3d 761, 617 N.E.2d 11), and the propriety of the prosecutor's comments is within the trial court's discretion. (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 184, 484 N.E.2d 329.) A prosecutor's comments constitute reversible error only when they engender substantial prejudice against a defendant such that it is impossible to say whether a guilty verdict resulted from the comments. *People v. Ward* (1992), 154 Ill. 2d 272, 609 N.E.2d 252.

■ In the present case, defendant has not shown that the verdict would have been different had the comment not been made. Ross gave credible testimony at trial identifying defendant as his assailant. Moreover, the trial court properly instructed the jury that closing arguments are not evidence and that any statement or argument made by the attorneys which is not based on the evidence should be disregarded.

Next, defendant contends that the State improperly used evidence of Ross' depression, suicide attempt and subsequent hospitalization in Madden Mental Health Institute to arouse the sympathy of the jury. Defendant argues that although prior to trial, the trial court ruled that defense counsel could cross-examine Ross regarding his hospitalization and depression subsequent to the shooting in terms of its effect on Ross' memory, the State brought out additional evidence that Ross lost his job, engendering the jury's sympathy for Ross.

The State responds that defendant has waived this argument for review for failure to both object at trial and raise the objection in his post-trial motion. Alternatively, the State argues that defendant consented to the testimony.

■ The record indicates that defendant failed to raise this issue in his post-trial motion. We therefore find that defendant has waived review of this issue. (*Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.) We further find that had defendant not waived this issue, his contention is without merit. The record shows that prior to trial, the trial court ruled that defense counsel could bring out evidence of Ross' depression and subsequent admission to Madden, and that defense counsel could bring out the fact that depression could cause problems with memory. With regard to the questions the prosecutor could ask of Ross, the trial court determined:

"THE COURT: He may simply be asked a factual question of when did this bout or when did this problem occur and if he says the day after I was shot or while I was recovering or if he says not until six months after I was shot then he may testify to those facts.

DEFENSE COUNSEL: Okay.

THE COURT: *** That's the way it stands. You can ask questions about the alcoholism, the depression, where he is, his status, for instance if it does indeed affect his memory."

At trial, the prosecutor questioned Ross as follows on direct examination:

"PROSECUTOR: *** Are you still employed?

ROSS: No.

PROSECUTOR: Did you lose your job?

ROSS: Yes.

DEFENSE COUNSEL: Judge, objection to that question.

THE COURT: Overruled.

PROSECUTOR: How long have you been unemployed?

ROSS: For a year.

PROSECUTOR: Since this happened?

ROSS: Yes."

Ross then testified that he was currently staying at Madden and that he signed himself in in April because: "I was having problems coping with things that was happening to me and I felt suicidal and depression." Ross testified that he first started having the problems about a month after he was shot. The record shows that defense counsel acquiesced in the introduction of the evidence prior to trial and subsequently utilized the evidence in his closing argument:

"DEFENSE COUNSEL: *** I feel bad for the problems the young man [Ross] has undergone. He is presently living at the Madden Mental Health Center. We did not ask him about that. He suffers from an attempt suicide a few months ago. Apparently he suffers from depression. He suffers from alcoholism or he did suffer from alcoholism he said ***. People who suffer from

depression have problems sometimes with their ability to perceive."

Under the circumstances, we find proper the testimony regarding Ross' status, mental state and well-being.

Finally, defendant contends that he was prejudiced by several comments made by the prosecutor during closing rebuttal argument, and thereby denied a fair trial.

When reviewing allegations of prosecutorial misconduct, the complained-of remarks must be considered in the context of the entire closing arguments of both the State and the defendant. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76, 514 N.E. 2d 970.) Where the complained-of remarks are within the rebuttal argument, they will not be held improper if they appear to have been provoked or invited by the defense counsel's argument. *People v. McKinley* (1992), 242 Ill. App. 3d 124, 609 N.E.2d 720.

Defendant cites the following comments made by the prosecutor during rebuttal closing argument as improper:

> "PROSECUTOR: *** And you know what, the defense hasn't given you—do you know what you need in order to buy the bag of goods that they are trying to sell you? A motive. What motive does Howard Ross have to lie?"

The court overruled defense counsel's subsequent objection. The prosecutor continued her argument stating:

> "PROSECUTOR: *** And this is not just misidentification as the defense would have you believe. The defendant in order to buy what they are telling you, you have to believe that Howard Ross got on that stand and he lied under oath. What motive does he have to lie? He wants the person that shot him to pay for it, as he should."

Again, defense counsel's subsequent objection was overruled.

Defendant initially argues that the prosecutor's comments improperly shifted the burden of proof to the defendant. Defendant cites to *People v. Tyson* (1985), 137 Ill. App. 3d 912, 485 N.E.2d 523, where the court found reversible error the prosecutor's statement in closing argument that the defendant was required, but had failed, to present a theory of innocence. The *Tyson* court further found that because the trial court failed to admonish the jury to disregard the comment, the harmful effect was not cured.

■ *Tyson* is distinguishable from the present case. At no time did the prosecutor here state that the defendant was required to prove his innocence. In fact, the prosecutor in the present case clearly stated:

> "PROSECUTOR: *** in order for the State to sustain our

charge of attempt murder, we must prove that the defendant \*\*\* performed \*\*\* an act which constituted a substantial step toward the commission of the offense of first degree murder."

The record further indicates that the trial court instructed the jury on the presumption of innocence and the State's burden of proving the guilt of the defendant beyond a reasonable doubt.

Defendant further relies upon *People v. Wilson* (1990), 199 Ill. App. 3d 792, 557 N.E.2d 571. There, the defendant was convicted of attempted criminal assault. The complainant admitted at trial that the defendant had not threatened, slapped or punched her, and neither party removed any clothing. The record indicated that complainant was not injured by defendant, and other than a self-inflicted wound, she had no bruises or other marks of a struggle. The record further disclosed that the principal witness for the prosecution had a motive to lie about the assault. This court found that the evidence, while sufficient to prove guilt, was not overwhelming. In closing argument, the prosecutor stated:

"Is it curious to anyone the defense would have you believe everybody in this case is guilty except the Defendant? [State's witness] Kondal committed perjury. The State's Attorney is guilty of trying to frame someone. [The victim] is guilty." (*Wilson*, 199 Ill. App. 3d at 796.)

We held that the prosecutor misstated the law by suggesting incorrectly what the jury must find to reach a certain verdict and remanded the case for a new trial. *Wilson*, 199 Ill. App. 3d at 797.

In the present case, the defendant's sole argument was that he was wrongly identified as Ross' assailant. Defense counsel subsequently attacked Ross' identification in closing argument, stating *inter alia*:

"DEFENSE COUNSEL: My goodness, can he positively identify Anthony Crowder as one of those 3 people based upon what you heard: Could he positively identify anybody, anybody at all based on what you heard?"

Defense counsel never took issue with the evidence of the attempted murder and thereby made the issue of defendant's identity the central issue at the trial.

We find that the comments in the present case do not rise to the level of the prosecutor's comments in *Wilson*. In *Wilson*, the sufficiency of the evidence, not identification, was the central issue at trial. In the present case, the comments of the prosecutor on rebuttal were invited by the comments of defense counsel during closing argument and thus do not exceed the bounds of proper debate. Even if the prosecutor's comments were improper, any impropriety consti-

tutes harmless error under the circumstances, as the record demonstrates that the verdict would not have been otherwise had the comments not been made. See *Williams*, 147 Ill. 2d at 232.

For the above reasons, the judgment of the trial court is affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.