FIFTH DIVISION
May 18, 2007

No. 1-04-2704

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| LATONYA STARNES, | ) | Honorable |
| | ) | Lawrence P. Fox, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Latonya Starnes was convicted following a jury trial of the first-degree murder of her infant son, Bryant, and sentenced to 50 years in prison. Defendant raises five issues on appeal. Defendant argues she was denied a fair trial because the prosecutor during rebuttal argument said the defense theory of the case amounted to an accusation of conspiracy against the State's witnesses. The defendant contends the jury was improperly instructed on the law as to her eligibility for an extended-term sentence and her 50-year sentence was excessive. She also seeks correction of her mittimus to reflect credit for an additional 60 days of time served. Finally, defendant argues that the required extraction of her blood and storage of her DNA profile violates her fourth amendment rights. For the reasons set forth below, we affirm.

BACKGROUND

Shortly after 8:30 p.m. on December 29, 2001, paramedics were called to a home at 5800

S. Wolcott Avenue in Chicago to treat 11-month-old Bryant Starnes. When they arrived, Bryant was unconscious and not breathing. He was rushed by ambulance to Holy Cross Hospital, and paramedics administered CPR. Their efforts were unsuccessful, however, and Bryant was pronounced dead later that night at the hospital.

Shortly after Bryant was pronounced dead, around 9:20 p.m., Chicago police officer Rachel Krass received a call to report to Holy Cross Hospital regarding a death investigation. At the hospital, Officer Krass spoke to defendant Latonya Starnes, who told Krass that her baby had been crying, shaking, and acting strangely all evening. She told Officer Krass that she was dressing the baby in a snowsuit and preparing to take him outside when she discovered he had stopped breathing.

The following day, Dr. Kendall Crowns of the Cook County medical examiner's office performed an autopsy on the child and determined that Bryant had died from blunt trauma to the abdomen, causing laceration of the liver and hemoperiteneum, or blood in the abdominal cavity. Dr. Crowns ruled the death a homicide, and he would later testify during defendant's criminal trial that Bryant's liver laceration was the largest he had ever seen in a child.

On the morning of January 1, 2002, Chicago police detective Michael Adams was assigned to investigate Bryant's death. Adams and his partner went to the home at 5800 S. Wolcott Avenue, where they asked defendant and her mother, Allean Eurby, to come to Area One police headquarters for questioning. When the women arrived at Area One headquarters, they were placed in separate rooms and given their Miranda warnings. During questioning, defendant told police that around 6 p.m. on December 29, 2001, she went to McDonald's to pick up dinner,

leaving Bryant alone with defendant's boyfriend, Antwon McBride (McBride). After defendant returned home 15 to 20 minutes later, she ate her dinner and went into her bedroom, where Bryant was sleeping. She noticed that Bryant was acting strangely, and she called an ambulance. She then began dressing Bryant in a snowsuit in preparation for taking him to the hospital.

Defendant remained at Area One headquarters while police left to question McBride. When the officers returned and informed defendant that her boyfriend had not corroborated her account, she changed her story. Defendant on videotape stated that during the evening of December 29, 2001, she was alone with Bryant in McBride's bedroom (defendant, Bryant, McBride, McBride's mother, and several members of his family all lived together in the house on Wolcott). McBride had left the house earlier to go to a party, and the defendant was depressed and frustrated that she had to watch the baby and could not accompany him to the party. Defendant then went to McDonald's to pick up dinner for herself, McBride's mother, and some other relatives, and she returned 15 to 20 minutes later. After eating her dinner, defendant returned to McBride's room, where Bryant was sleeping. She watched television and once again began feeling depressed. She thought about taking her own life, but then thought it would be better to end Bryant's life. She then straddled the baby, put her hands on his right abdomen, and pushed down three times, increasing the pressure each time until, by the third time, she was pushing with all of her body weight during her videotaped statement, which was played for the jury at trial, defendant demonstrated on a doll how she pushed on Bryant's abdomen. The baby began moaning and, after a few minutes, his lips began changing color, and the defendant said in her statement that she knew he was in pain.

3

1-04-2704

Defendant then called her mother, called a friend from church, and told members of the McBride family who were at the apartment that something was wrong with her baby, though she did not tell them that she had pushed on his abdomen. She then began dressing Bryant in a snow suit and prepared to take him to the hospital. Eventually, an ambulance was called, and Bryant was rushed to the hospital, where he was pronounced dead.

PROSECUTOR'S REMARKS DURING REBUTTAL
ARGUMENT DID NOT DENY DEFENDANT A FAIR TRIAL

Defendant argues she was denied a fair trial because the prosecutor stated during rebuttal argument that the defense theory of the case amounted to an accusation of a conspiracy by the police, medical personnel and the McBride family. Defendant contends such argument "shifted the burden of proof to Starnes to disprove the existence of such a conspiracy by showing that the police officers, medical personnel, and the McBride family had lied."

Prosecutors must demonstrate respect and due regard for a defendant's constitutional right to a fair and impartial trial. People v. Clark, 114 Ill. App. 3d 252, 256 (1983). Prosecutors are, however, allowed great latitude in closing argument, and improper comments generally do not require reversal unless they result in substantial prejudice to the accused. People v. Sutton, 316 Ill. App. 3d 874, 893 (2000). While a prosecutor may not make arguments or assumptions that have no basis in evidence, improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused. People v. Tipton, 207 Ill. App. 3d 688, 699-700 (1990).

"In determining whether a prosecutor's closing comments are prejudicial, reference must be made to the content of the language used, its relation to the evidence, and the effect of the

4

argument on the rights of the accused to a fair and impartial trial." <u>People v. Brown</u>, 113 Ill. App. 3d 625, 630-31 (1983). Where there are allegations of prosecutorial misconduct, the arguments of both the prosecutor and the defense attorney must be reviewed in their entirety so that the prosecutor's statements can be put in their proper context. <u>Sutton</u>, 316 Ill. App. 3d at 893. Finally, where the challenged comments are part of rebuttal closing argument, "they will not be held improper if they appear to have been provoked or invited by the defense counsel's argument." <u>People v. Crowder</u>, 256 Ill. App. 3d 91, 100 (1993).

In the instant case, regarding the prosecution's theory of the case, defense counsel stated during various points in closing argument as follows:

> "They had a theory and that theory was Latonya. They didn't talk to her until 10:30.
>
> The purpose of going into that room was to get a statement out of her in order to get the medical examiner to make some kind of ruling and they had a theory. Even the medical examiner now has gone in with this theory.
>
> * * *
>
> So they keep trying to fit this theory, like there's something wrong with her putting her child in a snow suit.
>
> * * *
>
> What you know - - Think about that tape. I know the tape was hard for each and every one of you to watch. But the thing is those are things that were fed to her. She never hurt that baby.

She tried to get help. She went out there, they laughed at her; well, you don't know anything about babies. Not one of them called an ambulance. They had a car there. One of the people there had a car - -

\* \* \*

Laceration to a liver. You know the baby bled out. But what the medical examiner says as far as how it happened does not match his report. What they have her say in the video does not match his report. And what that shows you is that you do not know beyond a reasonable doubt whether the baby's death, the laceration was caused intentionally by human hand or by an accident. You don't know that."

During rebuttal closing argument, the prosecutor responded to defense counsel's argument that various witnesses, including police officers and medical personnel, conspired to frame defendant for the death of her son. The prosecutor began the rebuttal as follows:

"What are they asking you to believe happened here? What happened here? What are they asking you to believe? That she is the victim of a conspiracy? That somehow the police officers, the detectives, Adams and Lewis, the medical examiner, the paramedic, Jim Stohl, the police officer, Officer Krass, they all got together, and they got together with the McBride family and they decided, hey, you know what we're going to do, we've got a dead baby and

6

we're going to put it on her. Maybe they met in a coffee shop, maybe right before the murder, hey, you know, we're going to pin this case on her, we got a dead baby, we're going to put it on someone, we'll put it on her.

Is that what they're asking you to believe? What a joke. How outrageous. That's what they want you to believe, that this is some sort of conspiracy, that some detectives, Adams and Lewis, got together with the McBrides and said, okay, we'll put - - we're going to murder the baby and then put it on her.

Well, let's see we need some help. Hey, give Dr. Crowns a call at the Medical Examiner's Office. He'll help us. You know, we will need a police officer, paramedic. Let's give Jim Stohl a call. Let's give - - We need some other people. Let's get the McBrides here. We'll get Antwon involved in this.

Is that what happened here? What a joke. That's not what happened.

* * *

You know, with regard to this conspiracy, the conspiracy they want you to believe that somehow everyone got together to put it on her, why not put it on Antwon? Why not put the case on Antwon? Why her? Out of the blue Detective Lewis, Detective Adams, Dr. Crowns, they haven't testified they know her and have

7

anything against her, and they are going to conspire with the

McBride family to put this case on her for no reason and let the real

baby killer go and then force her to confess?

* * *

What they are asking you to believe is ridiculous. It's

ridiculous and outrageous, that there is some sort of conspiracy

here against her."

In addressing defendant's argument that these comments by the prosecution deprived her of a fair trial, we find People v. Jackson, 299 Ill. App. 3d 104 (1998), instructive. In Jackson the defendant contended the prosecution in rebuttal argument shifted the burden of proof by characterizing the defense theory as an accusation of conspiracy against the defendant by various persons, including the prosecution, police, and the victim. In rejecting this argument, Jackson found the prosecution's argument was invited by defense counsel's argument that the police fabricated evidence and lied to defendant to obtain a confession. Jackson, 299 Ill. App. 3d at 109-10. The court in Jackson concluded as follows:

"The remarks made by the State regarding a conspiracy were in

response to the defense counsel's remarks that the detectives

fabricated evidence and lied to defendant. Moreover, the State did

not tell the jury that it had to believe that all the State's witnesses

were lying in order to acquit defendant. We find there was no

error." Jackson, 299 Ill. App. 3d at 110.

8

1-04-2704

In the instant case, similar to Jackson, the prosecution in rebuttal was responding to defense counsel's arguments that the police had a theory, fed it to defendant, and had her say things on the videotape that did not match the medical examiner's report. The prosecution was responding to defense counsel's argument that "[e]ven the medical examiner now has gone in with this theory" and what the police "have her say in the video does not match his report." When viewed in context of defense counsel's argument that the police had a "theory," the medical examiner was in on it, and the police "fed" defendant the statements she made, the prosecutor's response was proper. Jackson, 299 Ill. App. 3d at 110. Indeed, the comments were clearly invited by defense counsel's argument and, as such, they are proper. People v. Crowder, 256 Ill. App. 3d 91, 100 (1993) (remarks by prosecution in rebuttal argument are not improper if provoked or invited by defense counsel's argument).

However, even if the prosecutor's comments were improper, the record does not reflect the defendant was prejudiced or deprived of a fair trial. On the contrary, the trial judge instructed the jurors that anything either of the attorneys said during closing arguments should not be considered as evidence and any comments not based on the evidence should be disregarded. The record reflects no reason to conclude that the jury disregarded these instructions. People v. Illgen, 145 Ill. 2d 353, 376 (1991) (it is presumed the jury will follow the instructions). Moreover, any error would be harmless beyond a reasonable doubt based on the strength of the evidence demonstrating defendant's guilt. People v. Cisewski, 118 Ill. 2d 163, 175 (1987); People v. Wood, 341 Ill. App. 3d 599, 614-15 (2003). For the reasons previously discussed, we reject defendant's argument that the prosecution's comments during rebuttal denied defendant a fair trial.

9

## JURY INSTRUCTIONS REGARDING
## ELIGIBILITY FOR AN EXTENDED-TERM SENTENCE

Defendant contends the jury was improperly instructed regarding her eligibility for an extended-term sentence, thereby depriving her of a fair trial. In support of that argument, defendant relies on the fact that instructions and verdict forms were defective because they required the jury to determine unanimously that defendant's conduct was *not* "brutal or heinous" beyond a reasonable doubt.

Under the due process clause of the fifth amendment, as well as the notice and jury trial guarantees of the sixth amendment, " 'any fact (other than [a] prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.' " Apprendi v. New Jersey, 530 U.S. 466, 476, 147 L. Ed. 2d 435, 446, 120 S. Ct. 2348, 2355 (2000), quoting Jones v. United States, 526 U.S. 227, 243 n.6, 143 L. Ed. 2d 311, 326 n.6, 119 S. Ct. 1215, 1224 n.6 (1999).

In Illinois, trial courts are responsible for making sure that the jury is properly instructed on the elements of the charged offense (People v. Davis, 313 Ill. App. 3d 585, 589 (2000)), as well as any factors that may increase the maximum penalty for an offense (Apprendi, 530 U.S. at 476, 147 L. Ed. 2d at 446, 120 S. Ct. at 2355). A trial court need not rely on pattern jury instructions, however, and may in its discretion use nonpattern jury instructions. People v. Pollock, 202 Ill. 2d 189, 211 (2002) (decision to use nonpattern jury instructions reviewed for abuse of discretion); People v. Hudson, 222 Ill. 2d 392, 407-08 (2006) (finding no reversible error, even where a clearer and more concise instruction could have been given).

In the instant case, because a finding by the jury that the defendant's crime was accompanied by "brutal or heinous behavior" was an aggravating factor that could potentially increase the maximum penalty for the offense, that fact had to be submitted to the jury and proven beyond a reasonable doubt. Apprendi, 530 U.S. at 476, 147 L. Ed. 2d at 446, 120 S. Ct. at 2355. Similarly, the fact that the victim was less than 12 years old was an aggravating factor that subjected the defendant to potentially greater punishment and, as such, this fact had to be submitted to the jury and proven beyond a reasonable doubt.

Defendant contends the instructions and verdict forms were defective because in order to preclude consideration of the aggravating factor they required the jury to unanimously determine beyond a reasonable doubt that the defendant's conduct was *not* brutal or heinous. The jury in the instant case was instructed as follows:

> "We, the jury, find the fact does not exist, beyond a
> reasonable doubt, that the offense of first degree murder was
> accompanied by exceptionally brutal or heinous behavior indicative
> of wanton cruelty and that the victim was under 12 years of age."
> [followed by lines for 12 signatures]

And

> "We, the jury, find the fact does exist, beyond a reasonable
> doubt, that the offense of first degree murder was accompanied by
> exceptionally brutal or heinous behavior indicative of wanton
> cruelty and that the victim was under 12 years of age."
> [followed by lines for 12 signatures]

Defendant, relying on People v. Ramey, 152 Ill. 2d 41, 77 (1992), contends the instructions and verdict forms were "seriously flawed in requiring a unanimous decision that Starnes' conduct was not brutal and heinous." In Ramey, the court resolved a similar challenge as to whether a verdict against the death penalty need be unanimous and concluded that "the belief by one juror that any one mitigating factor sufficient to preclude the death penalty exists is sufficient to do so." Ramey, 152 Ill. 2d at 77; see People v. Miller, 173 Ill. 2d 167, 196-98 (1996) (a verdict against the death penalty need not be unanimous).

Defendant argues the Illinois Pattern Jury Instructions, specifically, IPI Criminal 3d Nos. 7B.10 and 7B.12, used in first-stage death penalty hearings, are instructive. Illinois Pattern Jury Instructions, Criminal, Nos. 7B.10, 7B.12 (3d ed. 1992). We agree that the format of those instructions could be helpful in developing more clear instructions for the jury regarding the issues raised by the State's requirement to prove beyond a reasonable doubt any factor that qualifies a defendant for an enhanced sentence.

In the instant case, the verdict forms could have provided as follows:

We, the jury, unanimously find beyond a reasonable doubt that the defendant Latonya Starnes is eligible for an enhanced sentence under the law. We unanimously find beyond a reasonable doubt that the offense of first degree murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and that the victim was under 12 years of age.

[lines for 12 signatures follow]

> We, the jury, cannot unanimously find beyond a reasonable doubt that the defendant Latonya Starnes is eligible for an enhanced sentence under the law. We cannot unanimously find beyond a reasonable doubt that the offense of first degree murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and that the victim was under 12 years of age.
>
> [lines for 12 signatures follow]

The other instruction reflecting this issue could similarly have been modified. The above language, unlike the language used in the instant case, cannot be argued to have shifted the burden of proof to the defense.

In the instant case, the defendant recognizes that the trial court did not impose an extended-term sentence based on the jury's finding that defendant's conduct was brutal or heinous. However, defendant argues "it cannot be determined whether the trial court would have sentenced Starnes to a term closer to the minimum (20 years), had the improper jury finding of an aggravating factor not been made." We recognize that the trial court sentenced defendant close to an extended-term sentence and the trial court acknowledged that fact.

We note, the record does not reflect that the experienced trial judge in any way relied on the brutal or heinous findings made by the jury in imposing sentence. Such findings would become relevant if the sentencing judge was considering an extended-term sentence or a life sentence. Apprendi, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63; see People v. Rovito, 327 Ill. App. 3d 164, 178 (2001). In resolving defendant's motion for new trial, which immediately preceded the sentencing hearing, the trial judge demonstrated an accurate

understanding of the law as it related to the issue of enhancing defendant's sentence based on exceptionally brutal or heinous conduct as reflected by the following:

> "THE COURT: And, of course, all of this stuff with respect to brutal and heinous would only come into play if the defendant is eventually sentenced to extended term in this case, and if she isn't sentenced to an extended term, then there isn't any issue as far as I'm concerned."

The unenhanced sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2000). Defendant was sentenced to 50 years in the Illinois state penitentiary. Had the judge relied on the jury's findings that the victim was under age 12 and that the offense was accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty, the defendant would have been eligible for an extended-range sentence of 60 years' to 100 years' imprisonment or natural life imprisonment. 730 ILCS 5/5-5-3.2(b)(2), (b)(4), 5-8-2(a)(1) (West 2000). We are mindful that defendant challenges the instructions related to the finding of brutal or heinous behavior by the jury, and further challenges the impact of that finding on the 50-year sentence imposed by the trial judge. However, the record reflects that no enhanced sentence was imposed and no comment by the judge suggested an enhanced sentence was under consideration. As previously noted, the trial court acknowledged the 50-year sentence was close to an extended-term sentence, but also correctly recognized that issues regarding "brutal and heinous would only come into play if the defendant is eventually sentenced to extended term in this case."

In determining whether a mistake or misunderstanding of the law by the trial judge influenced the sentencing decision and deprived defendant of a fair sentencing hearing, we note that reviewing courts "look to whether the trial court's comments show that the court relied on the mistaken belief or used the mistaken belief as a reference point in fashioning the sentence." People v. Hill, 294 Ill. App. 3d 962, 970 (1998). This is unlike the situation where the judge imposes a sentence based on an incorrect understanding of the law or a faulty factual finding. People v. Hausman, 287 Ill. App. 3d 1069, 1072 (1997) (and cases cited therein). Moreover, not every misstatement or misunderstanding by the trial judge actually influences the sentencing decision. People v. Beals, 162 Ill. 2d 497, 510-11 (1994) (finding no plain error existed where the trial court improperly stated the maximum sentence was natural life and sentenced the defendant to 80 years in prison). As previously discussed, the trial judge in the instant case was not operating under any misunderstanding when he imposed the 50-year unenhanced sentence.

We further note that the decision to use a non-IPI jury instruction is within the discretion of the trial court. People v. Pollock, 202 Ill. 2d 189, 211 (2002). At the point in time when this case was tried, the IPI instructions had not been modified to comply with Apprendi. "Where there is no IPI jury instruction on a subject on which the court determines the jury should be instructed, the court has the discretion to give a non-IPI instruction." Hudson, 222 Ill. 2d at 400. While it would have been preferable to have used a more precise instruction and verdict form in order to communicate to the jury that a single juror's "no" vote would prevent an affirmative verdict of brutal or heinous conduct, we find no abuse of discretion.

Moreover, the record reflects that any confusion or error was harmless beyond a reasonable doubt and had no impact on the sentence imposed by the trial judge. People v. Rovito,

15

327 Ill. App. 3d 164, 178 (2001) (<u>Apprendi</u> error was harmless where the trial court did not impose an extended-term sentence). The trial judge did not impose either a natural life sentence or an extended term; accordingly, <u>Apprendi</u> concerns were not implicated. The record reflects the brutal or heinous finding by the jury was not a sentencing factor considered by the trial judge in imposing the unenhanced 50-year sentence. For the reasons previously discussed, we reject defendant's argument that she was prejudiced by any instruction error.

TRIAL COURT DID NOT ABUSE ITS DISCRETION BY SENTENCING DEFENDANT TO 50 YEARS IN PRISON FOR THE FIRST-DEGREE MURDER OF HER INFANT SON

Defendant contends the trial court abused its discretion in sentencing her to 50 years in prison for the first-degree murder of her infant son because the sentence gave inadequate consideration to defendant's youth, lack of criminal history, background, and potential for rehabilitation.

A trial court's imposition of sentence is entitled to great deference. <u>People v. O'Neal</u>, 125 Ill. 2d 291, 297 (1988). Although a reviewing court has the authority to reduce a sentence, the court may only exercise this authority if the trial court abused its discretion in imposing the sentence. 134 Ill. 2d R. 615(b)(4); <u>People v. Porter</u>, 277 Ill. App. 3d 194, 200 (1995). A reviewing court should not, however, substitute its judgment for that of the trial court and reduce an offender's sentence merely because it would have weighed the factors differently and reached a different result. <u>People v. Streit</u>, 142 Ill. 2d 13, 19 (1991). Generally, the trial court is in a better position than a court of review to determine an appropriate sentence considering the particular facts and circumstances of each individual case. <u>People v. Perruquet</u>, 68 Ill. 2d 149 (1977). The trial court is the proper forum for the determination of a defendant's sentence, and the trial

court's sentencing decisions are entitled to great deference and weight. Perruquet, 68 Ill. 2d at 154. If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. People v. Fern, 189 Ill. 2d 48, 54 (1999).

Under Illinois law, a defendant convicted of first-degree murder shall be sentenced to no less than 20 and no more than 60 years in the Illinois state penitentiary. 730 ILCS 5/5-8-1(a)(1)(a) (West 2000). In the instant case, a review of the record indicates the judge relied on proper aggravating and mitigating factors in imposing sentence. The record reflects the trial court was fully aware of the circumstances surrounding the crime and of defendant's lack of criminal history. Relevant factors in determining an appropriate sentence include the nature of the crime, protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects and youth. People v. Whitehead, 171 Ill. App. 3d 900, 908 (1988). Additionally, the sentencing judge may consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. Fern, 189 Ill. 2d at 53. The weight attributed to each factor in aggravation and mitigation in imposing a sentence depends on the particular circumstances in each case. People v. D'Arezzo, 229 Ill. App. 3d 428 (1992).

We note that a trial court need not articulate the process by which it determines the appropriateness of a given sentence. People v. Wright, 272 Ill. App. 3d 1033, 1045-46 (1995). In the instant case, the experienced trial judge properly considered factors in aggravation and mitigation and sentenced defendant within the statutory range. He concluded as follows:

"This was an absolutely senseless, selfish, and premeditated

act on the part of the defendant. And I believe that the evidence

17

shows that her motive was basically that the child was cramping her life-style and that she just wanted to get rid of it.

I'm also negatively impressed by her testimony at trial and what she said when she testified and her lack of remorse that the State has appropriately argued here.

But, I don't think under the totality of the circumstances it's necessary to sentence her to an extended term sentence. I do, however, think it's necessary to sentence her to close to an extended term sentence. And I have given this case a lot of thought, and I have considered all of the factors in aggravation and mitigation provided by statute that I'm required to consider, and I think that the appropriate sentence based on the evidence that I heard in this case and the history and character of the defendant is a sentence of 50 years Illinois Department of Corrections."

The trial court was informed of the defendant's youth, her difficult background, her lack of a criminal history, and her potential for rehabilitation. Defendant murdered her own defenseless, infant son by pressing on his abdomen with such force that his liver was lacerated nearly in half. She then watched for several minutes as the baby moaned and lost consciousness. She did this, as reflected in her videotaped statement, because she wanted to attend a party with her boyfriend and felt the baby was holding her back. When she addressed the court during sentencing she expressed no remorse, but only articulated concern regarding what sentencing credits she would receive.

18

1-04-2704

For the reasons previously discussed, we do not find that the sentence imposed in this case is at odds with the purpose and spirit of the law or disproportionate to the nature of the offense. Accordingly, we conclude the experienced trial judge considered the appropriate factors in sentencing defendant. The sentence imposed was an appropriate exercise of discretion and the 50-year term was not excessive.

## DEFENDANT'S MITTIMUS WILL BE CORRECTED TO REFLECT THAT SHE SERVED 943 DAYS PRIOR TO SENTENCING

Defendant's fourth claim on appeal is that she was incarcerated for 943 days prior to sentencing but received credit for only 883 days. She therefore asks this court to correct her mittimus to reflect an additional 60 days of sentencing credit. The State concedes that defendant is entitled to an additional 60 days of sentencing credit and notes that this court may correct the mittimus itself and need not remand to the trial court. People v. McCray, 273 Ill. App. 3d 396, 403 (1995). Accordingly, we instruct the clerk of the circuit court to correct defendant's mittimus to reflect credit for 943 days defendant spent in custody prior to sentencing.

## THE FORCED EXTRACTION OF DEFENDANT'S BLOOD AND STORAGE OF HER DNA PROFILE DO NOT VIOLATE DEFENDANT'S FOURTH AMENDMENT RIGHTS

Finally, defendant argues that the Illinois DNA databank statute (730 ILCS 5/5-4-3 (West 2004)), which provides that anyone found guilty of a qualifying felony must provide a blood, saliva, or tissue sample to the Illinois Department of State Police for DNA analysis and categorization into genetic marker groupings, violates the fourth amendment prohibition against unreasonable searches and seizures. We reject this argument, however, because the Illinois Supreme Court has recently held that the statute is constitutional. People v. Garvin, 219 Ill. 2d

19

1-04-2704

104, 125 (2006).

CONCLUSION

For the reasons previously discussed, we affirm defendant's conviction and sentence. We order the clerk of the circuit court to correct the mittimus to reflect credit for 943 days defendant spent in custody prior to sentencing. We reject's defendant's argument that the DNA statute is unconstitutional (730 ILCS 5/5-4-3 (West 2004)) and, accordingly, refuse to expunge her DNA records from the DNA database.

Affirmed; mittimus ordered corrected.

O'BRIEN, P.J., and GALLAGHER, J., concur.