2023 IL App (1st) 221177-U

No. 1-22-1177

Order filed June 28, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 60205 |
| | ) | |
| DERRICK MCMATH, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for aggravated battery where defendant executed
          a valid waiver of his right to a jury trial. We also affirm defendant's sentence and
          find that the trial court did not consider improper factors in aggravation or fail to
          consider certain factors in mitigation. We vacate defendant's conviction for
          aggravated unlawful use of a weapon in case no. 07 CR 22337.

¶ 2    Following a bench trial, defendant Derrick McMath was convicted of aggravated battery

and sentenced to seven years' imprisonment. On appeal, defendant contends that the trial court

violated his constitutional rights in accepting his jury trial waiver without ensuring that his waiver

was knowing and voluntary. Defendant also challenges his sentence on appeal, arguing that the trial court impermissibly considered his motivations and his decision to remain silent, and failed to consider his mental health history and rehabilitative potential. Lastly, defendant asserts this court should vacate his conviction of aggravated unlawful use of a weapon (AUUW) in a prior case not before this court pursuant to *In re N.G.*, 2018 IL 121939, and *People v. Aguilar*, 2013 IL 112116. For the reasons that follow, we affirm defendant's conviction of aggravated battery and sentence in the instant case and vacate his conviction of AUUW in case number 07 CR 22337.

¶ 3                                  I. BACKGROUND

¶ 4     Defendant was charged by indictment with four counts of aggravated battery for striking the victim, 67-year-old Susan Johnson, on the head while she was seated on a Chicago Transit Authority (CTA) train, causing her to lose an eye. At the conclusion of defendant's bench trial, the court found him guilty of all charges. The trial court sentenced him to seven years' imprisonment on count 1, aggravated battery causing great bodily harm in an individual 60 years of age or older, with the additional counts merging.

¶ 5                                    A. Pre-Trial

¶ 6     At a hearing on July 18, 2019, the defense tendered a forensic evaluation report performed by a doctor hired by the public defender's office to evaluate defendant. The State requested an evaluation for sanity at the time of the offense by Forensic Clinical Services. The trial court entered an order on July 18, 2019, referring defendant for a sanity evaluation by Forensic Clinical Services. The record contains a letter from court-appointed psychiatrist, Dr. Sarah E. Anderson, who examined defendant on October 2, 2019, and concluded that defendant was legally sane at the time of the offense.

¶ 7    At a hearing over video conference on August 30, 2021, the attorneys and the trial court set the case for a bench trial. At the date set for bench trial on November 2, 2021, the parties appeared and the State requested a postponement in order to obtain additional medical records for the victim. At the next court date, the parties again set a bench trial date of January 31, 2022, by agreement. The parties again postponed the bench trial due to the victim's medical reasons. At the rescheduled date, the parties again rescheduled the bench trial by agreement.

¶ 8                                    B. Jury Trial Waiver

¶ 9    On May 16, 2022, the parties reconvened for defendant's bench trial. At the outset, the trial court addressed the jury trial waiver. The record contains a written jury waiver by defendant dated May 16, 2022, stating, "I, the undersigned, do hereby waive jury trial and submit the above-entitled cause to the Court for hearing." Defendant's counsel informed the court that "Mr. McMath has executed a jury waiver, he wishes to proceed by way of bench trial." The following colloquy occurred between the trial court and defendant:

>        "THE COURT: Mr. McMath, I do have a document here, sir, it reads, 'I, the undersigned, do hereby waive jury trial and submit the above-entitled cause for hearing.' Is that your signature on the written jury waiver?
>
>        DEFENDANT: Yes, sir.
>
>        THE COURT: Do you know what a jury trial is?
>
>        DEFENDANT: Right, yeah.
>
>        THE COURT: Did anybody force you or threaten you in any way to get you to waive your right to a trial by jury?
>
>        DEFENDANT: No.

THE COURT: Did anyone promise you anything to get you to waive your right to a jury trial?

DEFENDANT: Yes, sir.

THE COURT: They did promise you something?

DEFENDANT: Yeah, yeah, yeah.

THE COURT: Who promised you something?

DEFENDANT: God.

THE COURT: God did?

DEFENDANT: Yes, sir, from his word.

THE COURT: All right. I don't think that would be the type of promise that would affect your jury waiver that—you are talking about something about your own personal religious beliefs and your association with God and all that but any waiver of trial by jury has to be knowingly and voluntarily by you and you should know that no one can promise you anything that would be necessarily enforceable by this court so you have to be the one that makes the decision whether or not you want to waive your right to a trial by jury or not, that—you and only you can make that decision.

DEFENDANT: I do waive my right.

THE COURT: So other than your faith did anybody else promise you anything to get you to waive your right to trial by jury?

DEFENDANT: No, sir.

THE COURT: Your attorney didn't promise you anything?

DEFENDANT: No.

THE COURT: No witnesses promised you anything?

DEFENDANT: No.

THE COURT: No deputies?

DEFENDANT: No.

THE COURT: This court?

DEFENDANT: No.

THE COURT: Are you waiving your right to a trial by jury of your own free will?

DEFENDANT: Yes, Sir.

THE COURT: All right, the jury waiver will be accepted by the court. I do know that on prior occasions based on the history of this particular case Mr. McMath was in fact evaluated and examined by Cook County's Forensics Division and he was found fit to stand trial according to the Forensic Services Division. I'm not sure which doctor it was at the time but he was also—it was the opinion of the examiners that he was sane at the time of the alleged offense as well."

¶ 10    Defense counsel informed the court that,

"the public defender's office in May of 2019 had consulted with an outside expert, a Dr. Seltzberg *** who was consulted on the basis of fitness and sanity, there was a finding not by Forensic Clinical Services but by an independent expert that Mr. McMath was insane at the time of the offense. However Mr. McMath does not wish to proceed with the affirmative defense of insanity at this time. I have consulted with Mr. McMath, I have consulted with other attorneys in my office as well as read relevant case law, I believe that Mr. McMath as he has not been found unfit, it is his decision to proceed with an affirmative

defense if he so chooses, he is not choosing to proceed with respect to that defense, I would ask your Honor to admonish him with respect to that."

¶ 11    The trial court admonished defendant regarding whether he wanted to pursue a defense of insanity, and defendant indicated he did not want his attorney to pursue this defense. The trial court questioned defendant regarding whether he was being forced or promised something in making this decision, and if he was making this decision of his own free will. The trial court then found:

"I believe that the defendant has knowingly and voluntarily exercised not only his right to waive his right to a jury but he has exercised his right to choose not to ask that an affirmative defense be used in his particular case and that's an affirmative defense being insanity, that is the choice of the defendant and the defendant who is competent is allowed to make that decision and Mr. McMath appears to this court to be competent today, his attorney has not raised his competency in any new motions since he was found competent so his choice will be honored by this court and we can go ahead and proceed with a bench trial without any affirmative defenses."

¶ 12                          C. Bench Trial

¶ 13    The victim, Susan Johnson, testified that she was 71 years old at the time of trial. On June 14, 2018, at approximately 11:15 a.m., she was on the Purple Line CTA train heading north to the Howard stop. She was sitting on the right side of the train in the first set of seats nearest to the door, behind the area for strollers or people in wheelchairs. She was sitting alone and reading her Kindle e-book and wearing glasses. She testified that when the train stopped at the Jarvis stop, she experienced "a movement, a flash of somebody moving and I suddenly felt a really hard blow to the side of my face on the left side of my face." She saw that the person who had hit her then "ran

in front of me and jumped off the train right as the doors were closing." She observed that the person was "tall and slender and he was—he was black."

¶ 14    Johnson testified that the left side of her face felt wet; she touched her face and saw blood. Her glasses had been knocked off, and she asked someone to help her find them. She put the glasses in her purse and wanted to know if someone could give her tissues because she was "bleeding a lot." She took some tissues out from inside her purse and attempted to wipe her face around her eye. Johnson testified that "I was bending over and looking down at the floor thinking the bleeding wasn't myself and on the floor of the car I could see something that looked gelatinous and it was grayish and I knew it was the inside of my eye."

¶ 15    The train continued moving and eventually stopped at the Howard station. Everyone exited the train except Johnson, who asked someone to call 911. She testified that a CTA attendant asked her to get off, but she stated that she could not, and she believed he may have called 911.

¶ 16    She testified that the paramedics arrived and bandaged her eye and transported her to the ambulance and then to the hospital. She received a CT scan and spoke with Dr. Kevin Patel, an eye surgeon, who informed Johnson  that "the eye was badly damaged and he was going to take me to surgery and do his best to try to save the eye." She had surgery that same day.

¶ 17    After the surgery, Johnson was "told that my eye would have to be removed because it couldn't be saved. He told me I had a broken orbit, the bone going around my eye was broken, my eye was of course damaged, *** I was hit with such force that my teeth were loosened and got out of alignment both on the top and the bottom on the left side of my mouth." Johnson also suffered a concussion. She was discharged later that evening. Johnson was very badly bruised on the left side of her face and down into her neck.

¶ 18 On June 15, 2018, she saw Dr. Paul Phelps, an oculoplastic surgeon, who took photos and scheduled a second surgery for June 19, 2018. Johnson explained that she needed a second surgery because her eye "was basically destroyed and they had to remove it for the same reason I said before, it had to be removed very quickly so it didn't harm my other eye." Dr. Phelps also repaired the fracture to her orbital area. However, it did not heal perfectly and there was still a bump below her left eye where the bone was broken. Dr. Phelps removed her left eye and replaced it with "a sphere which is a placeholder that will stay permanently and I will eventually have a prosthetic fake eye made to fit over that to look as normal as possible."

¶ 19 Johnson testified that she also had to go to an ocularist, who is "a person trained to make an acrylic shell that is custom made to fit over the eyeball." However, because there was so much internal damage behind her eye and in her head, "it was more complicated than normal[]" and she has been to the ocularist at least 40 times "because it's very hard to fit and this was harder than normal because of all the damage internally." The ocularist makes a mold of the inside to get an exact fit and then painted it to look like the other eye. Johnson testified that she experienced infection and "it was really, really unusually difficult to make it fit properly, he had to keep adjusting it and there was a lot of discomfort and pain and there is still a lot of discomfort and pain because of all the damage that was done."

¶ 20 Johnson testified that before the incident, she could see out of her left eye and had no pain in her eye. She is now totally blind in her left eye because it had to be removed following the trauma from the incident. Johnson identified a CTA video showing the attack and photographs taken of her following the attack.

¶ 21    Dr. Patel testified that he is a board-certified ophthalmologist and retinal specialist. He was on-call on June 14, 2018, at St. Francis Hospital, and examined the victim when she arrived with a severe eye injury and orbital wall fractures. He observed severe swelling and bulging of her upper left eye and severe bleeding when he tried to open her eye; the eye appeared grossly deformed and crushed. Dr. Patel sent her to surgery immediately. During surgery, Dr. Patel found that the sclera or white part of the eye was missing tissue; he attempted to suture it, but there was not enough tissue, and he concluded that the victim needed the eye removed. Dr. Patel testified that it would take a substantial amount of force to cause that much damage. He testified that "[t]his is probably the most [damage] I have seen, I actually have never not been able to save an eye, this is the only case I was not able to save an eye."

¶ 22    Dr. Phelps, an oculofacial plastic surgeon who performs reconstructive surgery on the eyelid, tear duct, and eye socket, including removal of the eye, testified that he examined Johnson on June 15, 2018. She had a severely damaged eyeball, lacerations around her eye, multiple orbital fractures in the bones around her eye socket, and severe bruising around her eye. She also had a ruptured globe, meaning that the white of the eyeball had been lacerated severely and contents inside the eyeball were coming out. She also had a complex eyelid laceration. Because the eye was blind and painful, Dr. Phelps recommended removal as there was no chance of recovering vision, and if left in too long, the immune system could start to attack both eyeballs. He performed the surgery to remove the eye and repair the orbital fractures on June 19, 2018. He had to put in a plate to repair the orbital fracture below her eye and replaced the eyeball with a silicone sphere. Dr. Phelps testified that the left eye is permanently blind, and Johnson also suffered permanent

disfigurement. After she healed, she was sent to an ocularist to have a shell made to fit on the silicone sphere that looked more like a real eye.

¶ 23    Nicolas Arriaga testified that he is a manager at Milwaukee Shoe and Ski on North Milwaukee Avenue in Chicago. On June 15, 2018, at approximately 2:15 p.m., Arriaga was working at the store when a man, whom he identified as defendant at trial, came into the store. Defendant was the only customer in the store and Arriaga was viewing him the entire time as it was a small store with no aisles. Defendant asked to try on a pair of shoes, which Arriaga brought to him. Arriaga testified that defendant tried the shoes on and walked around the store like he was "trying them out," but then defendant suddenly "bolted for the door." Arriaga chased after him and caught up to him down the block. He grabbed defendant's backpack and "we were going back and forth at it," but then defendant pulled away.

¶ 24    Arriaga testified that an off-duty or retired police officer pulled up in his car and asked if defendant had stolen something. Arriaga said he had, and the officer then pursued defendant and "grabbed him." Defendant's backpack was black with a stripe on it. Defendant had left behind his "brown beat up shoes with like a white stripe in the back" in the store. The police took both pairs of shoes as evidence. Arriaga identified a photograph of defendant, noting that defendant was wearing the exact same clothes at the time of the theft—a blue shirt with a white "Illinois" logo, pants, and the brown shoes with white on the back. He testified that the photographs of defendant accurately depicted the way he looked on the day of the theft and he remembered defendant "vividly."

¶ 25    Chicago police detective Martin Mulligan was in a marked squad car with his partner driving down Milwaukee Avenue at approximately 2:24 p.m. on June 15, 2018. He testified that

he observed "an older gentleman holding down a younger gentleman waving us down." He identified defendant at trial as the younger gentleman. Mulligan detained defendant and learned from the older individual, who was a retired police officer, that a retail theft had just occurred. Defendant was taken into custody.

¶ 26    Chicago police sergeant Michael Roth was assigned to investigate the aggravated battery and interviewed Johnson at the hospital on the same day as the attack. He testified that he observed that she had a large contusion above her left eye, describing that "it was rather gruesome, it was about the size of a golf ball and there was a little bit of blood in there, it was one of the most severe injuries I've ever seen short of a homicide." Roth also obtained the video recording from the CTA surveillance camera, in addition to still shots of defendant and two security bulletins. Roth used the video to generate "seeking to identify" bulletins and disseminated it to the rest of the police department and the community. It was posted to the Chicago Police Department's Facebook page. Another officer contacted Roth about the bulletin on June 15, 2018, and subsequently brought defendant to Area North where Roth was stationed. Roth observed that defendant was wearing "a white-blue T shirt with the words [*sic*] 'Illinois' across the chest," jeans, and brown shoes with a white stripe on the back. Defendant also had a large backpack with two red stripes. Roth also noted that defendant had an abrasion on the knuckle of his right index finger. Roth had an evidence technician take photographs of defendant and inventoried the backpack. The backpack contained miscellaneous items of clothing, defendant's birth certificate, and toiletries.

¶ 27    The trial court found defendant guilty of all charges, finding that the video evidence, still shots, and clothing proved that defendant was the individual who attacked Johnson on the CTA

train.[1] The trial court noted "the horrific nature of this unprovoked, inexplicable act by the part of someone who just hauls off and -- for no apparent reason comes up with a roundhouse right punch into the facial area of Ms. Johnson as she is sitting on the train reading her E book." The trial court noted that the video showed that defendant timed the attack with the stopping of the train and opening of the doors.

¶ 28    Defendant filed a motion for a new trial, which the trial court denied.

¶ 29                                  D. Sentencing

¶ 30    At sentencing, the State presented evidence in aggravation consisting of testimony by Evanston police officer Brian Hicks. Hicks testified about a similar attack by defendant on January 25, 2018, at the Dempster Street CTA train stop. Defendant struck a woman in the face with his closed fist while she was sitting on a bench waiting for the train and then ran away.

¶ 31    In addition, Johnson provided a victim impact statement. Johnson testified about her physical injuries—the loss of her left eye, surgery to repair her eye socket, her teeth being knocked out of alignment, a concussion, permanent nerve damage to the left side of her face, and recurrent severe headaches. She will have to see the ocularist for the rest of her life due to complex issues with the prosthetic eye and will require additional surgery. In addition to the physical injuries, she developed post-traumatic stress disorder, depression, and anxiety, and sees a therapist twice per week. Johnson testified that she has contemplated suicide, withdraws from people, and feels

---

[1]The parties stipulated that Chicago Transit Authority (CTA) employee, Patrick Flaherty, would testify that he is a security investigator for the CTA and is familiar with the CTA surveillance cameras in operation on train cars on the date of the offense, June 14, 2018. The cameras continuously record and provide a time and date stamp. The cameras on the train car where the offense occurred were in proper working order on that date and the video was downloaded onto two DVDs and given to the Chicago police detectives. Flaherty would also authenticate the two DVDs entered into evidence at trial, along with still photographs taken from those videos and CTA security bulletins Flaherty sent to the Chicago police.

"trapped under a giant dark unbearable sphere." Johnson also testified that her daily life has been impacted as she had to take driving lessons from a specialist but still could not drive without anxiety, her balance is "severely compromised," she feels overwhelmed in crowds, she requires a wheelchair in the airport, and her lifelong passions of reading and needlepoint are more difficult. She testified that the consequences of the attack will "go on and on."

¶ 32   In aggravation, the State argued that this was a "senseless" crime, unprovoked by the victim, who suffered severe, life-long injuries as a result,  defendant timed the attack purposely with the stopping of the train and opening of the doors, and defendant perpetrated a similar attack on another woman six months prior. The State argued for the maximum penalty, observing that counts one to three alleged aggravated battery to a senior causing great bodily harm, which was "three to seven years IDOC at 85 percent," and count four alleged aggravated battery to a transit passenger, which was "two to ten because he is extendible because of the victim's age and that's at 50 percent."

¶ 33   The defense argued in mitigation that both a psychologist and a psychiatrist retained by the public defender's office had found defendant to be legally insane at the time of the offense, although defendant elected not to proceed with that defense. The defense noted that Dr. Seltzberg diagnosed defendant with a "bipolar type of schizophrenic disorder." Defense counsel noted that defendant's family noticed a change in defendant in the beginning of 2018 when he began attending a church where some people had a negative influence on him, and he began hearing voices and "had some preoccupations," which led to the two incidents. Defense counsel argued that defendant has been incarcerated for over four years while awaiting trial, had not picked up any new cases while in prison, is close with his family, and deserved a sentence of time served.

¶ 34    The trial court acknowledged that defendant's presentence investigation report was filed. In sentencing defendant to seven years' imprisonment, the trial court stated that this was "one of the most disturbing cases that I have presided over as a judge" given the horrific nature of the injuries, the unsuspecting victim, the unprovoked attack, and defendant's commission of a similar offense a few months prior. The trial court noted that all counts merged into count one, a class 2 felony, which must be served at 85 percent because he caused great bodily harm to a victim over 60 years of age. It gave defendant credit for 1,502 days served. The State indicated it would *nolle pross* the charges in the other case.

¶ 35    Defendant filed a motion to reconsider sentence on grounds that, *inter alia*, it was excessive based on defendant's background and the nature of his participation in the offense. The trial court denied the motion. Defendant filed a timely notice of appeal.

¶ 36                                    II. ANALYSIS

¶ 37                                    A. Jury Waiver

¶ 38    Defendant first contends on appeal that the trial court accepted his jury waiver without first ensuring that he understood the difference between a jury trial and a bench trial.

¶ 39    Defendant concedes that he did not properly preserve this issue in the trial court. "*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphasis in original.) *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant argues, however, that relief is available under plain error review as the right to a jury trial is fundamental.

¶ 40    Under the doctrine of plain error, we may review unpreserved errors that would otherwise be waived "(1) where the evidence is closely balanced; or (2) when the errors are of such

magnitude that defendant was denied a fair and impartial trial and remedying the error is necessary to preserve the integrity of the judicial process." *People v. Nieves,* 192 Ill. 2d 487, 502-03 (2000). Under either prong, a defendant bears the burden of persuasion. *People v. Lewis,* 234 Ill. 2d 32, 43 (2009). Defendant asserts the jury waiver issue constituted second-prong plain error. However, before addressing this contention, we must first consider whether any error has occurred. *People v. Piatkowski,* 225 Ill. 2d 551, 565 (2007).

¶ 41 Our federal and state constitutions guarantee a criminal defendant's right to a trial by jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13. A defendant may knowingly and understandingly waive this right in open court. 725 ILCS 5/103-6 (West 2012); *People v. Bracey,* 213 Ill. 2d 265, 269-70 (2004). "There is no specific admonishment or advice the court must provide before accepting a waiver. [Citation.] Consequently, the effectiveness of a defendant's waiver depends on the facts and circumstances of each particular case." *People v. Reed*, 2016 IL App (1st) 140498, ¶ 7 (citing *People v. Bannister,* 232 Ill. 2d 52, 66 (2008)).

> "The crucial determination is whether the waiving defendant understood that his case would be decided by a judge and not a jury. [*Bannister,* 232 Ill. 2d at] 69. Although a signed jury waiver alone does not prove a defendant's understanding, it is evidence that a waiver was knowingly made. *People v. Dockery,* 296 Ill. App. 3d 271, 276 (1998). Similarly, a present defendant's silence while his or her attorney requests a bench trial provides evidence that the waiver is valid. See *People v. Brials,* 315 Ill. App. 3d 162, 176 (2000). Reviewing courts may also consider a defendant's prior interactions with the justice system in determining whether a jury waiver was made knowingly." *Reed*, 2016 IL App (1st) 140498, ¶ 7.

¶ 42    Defendant bears the burden of showing that his jury waiver was invalid. *Id.* (citing *People v. Stokes,* 281 Ill. App. 3d 972, 977 (1996)).

¶ 43    Reviewing all of the facts and circumstances here, we find that defendant knowingly and understandingly waived his right to a jury trial. We note that, at least twice in open court with defendant present, defendant's counsel and the State rescheduled his bench trial, without any objection by defendant. "[A]n accused typically speaks and acts through his attorney, and a jury waiver is valid when 'made by defense counsel in defendant's presence where defendant gave no indication of any objection to the court hearing the case.' " *People v. Scott*, 186 Ill. 2d 283, 285 (quoting *People v. Frey,* 103 Ill.2d 327, 332 (1984)). See also *Reed*, 2016 IL App (1st) 140498, ¶ 7; *Bracey*, 213 Ill. 2d at 270.

¶ 44    Moreover, on the day of defendant's bench trial, the trial court adequately admonished and ensured that defendant understood the right he was waiving and that he was doing so voluntarily. Before the trial began, defense counsel informed the court that defendant had executed a jury waiver and wished to proceed by bench trial. Defendant takes issue with the jury waiver form because it stated that defendant "waive[d] jury trial and submit[ted] the above-entitled cause to the Court for hearing," arguing that the word "hearing" was misleading and did not explain the difference between a bench trial and a jury trial. However, while a written waiver is not dispositive of a valid waiver, we may consider it as further evidence of defendant's intent to waive a jury trial, particularly when viewed in light of the trial court's colloquy with defendant and the other facts and circumstances of the case. *Reed*, 2016 IL App (1st) 140498, ¶ 7.

¶ 45    The trial court read the jury waiver form to defendant and asked defendant if that was his signature appearing on the waiver, and defendant affirmed that it was. The trial court specifically

asked, "Do you know what a jury trial is?" Defendant responded, "Right, yeah." In response to further questioning by the trial court, defendant indicated that no one threatened him into waiving his right to a jury trial.

¶ 46    The trial court also asked defendant if anyone promised him anything. Defendant responded in the affirmative. Upon further inquiry by the court, defendant related that, "God" promised him "from his word." Defendant asserts on appeal that the trial court failed to follow up on defendant's answer, which defendant contends should have "raised alarm bells," and that the trial court erroneously relied on its belief that defendant had been found fit to stand trial.

¶ 47    However, the record demonstrates that the trial court adequately probed defendant's response and that the parties and the court did not have concerns regarding defendant's fitness to stand trial. The trial court explained to defendant that defendant's personal religious beliefs would not "be the type of promise that would affect your jury trial waiver" and clarified that "any waiver of trial by jury has to be knowingly and voluntarily by you and you should know that no one can promise you anything that would be necessarily enforceable by this court so you have to be the one that makes the decision *** you and only you can make that decision." Defendant then responded, "I do waive my right." The court again clarified, "So other than your faith did anybody else promise you anything to get you to waive your right to trial by jury?" Defendant stated, "No, sir."

¶ 48    The trial court continued questioning, verifying that he was not promised anything by his attorney, the court, any witnesses, or deputies, to which defendant responded in the negative. Defendant reaffirmed that he was waiving his "right to a trial by jury of your own free will." The trial court then accepted the jury waiver.

¶ 49    The trial court also noted that defendant had been found fit to stand trial and sane at the time of the offense by the Cook County Forensic Services Division. Defense counsel interjected that the defense's outside expert had found defendant insane at the time of the offense, but that defendant did not want to proceed with an insanity defense. Defense counsel informed the court that: "I have consulted with Mr. McMath, I have consulted with other attorneys in my office as well as read relevant case law, *I believe that Mr. McMath as he has not been found unfit,* it is his decision to proceed with an affirmative defense if he so chooses, he is not choosing to proceed with respect to that defense, I would ask your Honor to admonish him with respect to that." (Emphasis added).

¶ 50    The trial court engaged defendant in a colloquy regarding his right to pursue a defense of insanity. Defendant indicated he did not want his attorney to pursue this defense, that he was not being forced or promised something in making this decision, and he was making the decision of his own free will. Following this colloquy, the trial court found that defendant knowingly and voluntarily waived both his right to a jury trial and his option to pursue an insanity defense, and that he appeared competent in court:

> "defendant has knowingly and voluntarily exercised not only his right to waive his right to a jury but he has exercised his right to choose not to ask that an affirmative defense be used in his particular case and that's an affirmative defense being insanity, that is the choice of the defendant and the defendant who is competent is allowed to make that decision and Mr. McMath appears to this court to be competent today, his attorney has not raised his competency in any new motions since he was found competent so his choice will be

honored by this court and we can go ahead and proceed with a bench trial without any affirmative defenses."

¶ 51    The above discussion between the trial court, defendant, and defense counsel demonstrate that defendant understood his right to a jury trial and knowingly waived it, and that the parties and the court had no concerns regarding his fitness to stand trial or ability to understand his rights and waive them. Defendant does not challenge the waiver of his right to pursue the insanity defense on appeal.

¶ 52    In addition to twice rescheduling his bench trial without any objection by defendant and executing a written jury waiver form, we further note that defendant was familiar with the criminal justice system in that he had prior convictions. When examining whether a waiver was knowing, we may consider defendant's silence when his attorney "requests a bench trial" as well as his "prior interactions with the justice system in determining whether a jury waiver was made knowingly." *Reed*, 2016 IL App (1st) 140498, ¶ 7. Considering all the facts and circumstances in the present case, we find defendant knowingly waived his right to a jury trial.

¶ 53    Because we have found that no error occurred, there can be no plain error. *Reed*, 2016 IL App (1st) 140498, ¶ 11.

¶ 54                                B. Sentencing Errors

¶ 55    Defendant next challenges his seven-year sentence, arguing that the trial court failed to consider mitigating factors—his mental health history and rehabilitative potential—and improperly considered defendant's possible motives and his decision to forgo allocution at sentencing.

¶ 56    Although defendant filed a post-sentencing motion for resentencing containing general claims of error, he did not object at the sentencing hearing to the trial court's alleged consideration of improper factors in aggravation and alleged failure to consider other factors in mitigation, and he did not specifically raise these issues in his post-sentencing motion.

¶ 57    To preserve a claim of sentencing error, a defendant must contemporaneously object and raise the issue in a written post-sentencing motion. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Defendant argues that this court should excuse his failure to object. However, the line of cases he cites is inapplicable to the present circumstances. Our supreme court has held that the court may excuse a lack of objection in the most compelling situations, where the trial court oversteps its authority in the presence of the jury, or when trial counsel was effectively prevented from objecting because an objection would have been futile or fallen on deaf ears. See *People v. Sprinkle*, 27 Ill. 2d 398, 401 (1963); *People v. Woods*, 2018 IL App (1st) 153323, ¶ 34; *People v. McLaurin*, 235 Ill. 2d 478, 488 (2009); *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). No such circumstances are present here.

¶ 58    To be entitled to relief for an unpreserved sentencing error, a defendant must show that a clear or obvious error occurred and either that the sentencing evidence was closely balanced or that the error was so egregious as to deny the defendant a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545. "If the defendant fails to meet his burden, the procedural default will be honored." *Id.*

¶ 59    Under the Illinois Constitution, a sentence is to be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Jones*, 2019 IL App (1st) 170478, ¶ 49. " 'Relevant factors in determining an appropriate sentence include the nature of the crime, protection of the public,

deterrence, and punishment, as well as the defendant's rehabilitative prospects and youth.' " *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123 (quoting *People v. Starnes,* 374 Ill. App. 3d 132, 143 (2007)). "A trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* The trial court must weigh both aggravating and mitigating factors in fashioning a sentence. *Jones*, 2019 IL App (1st) 170478, ¶ 50 (citing 730 ILCS 5/5-5-3.1, 3.2 (West 2014)). "Because the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, nor does the presence of mitigating factors either require a minimum sentence or preclude a maximum sentence." *Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 60    In determining a sentence, the trial court exercises broad discretion; a sentence falling within statutory limits is presumed proper, and we review it for an abuse of that discretion. *Jones*, 2019 IL App (1st) 170478, ¶ 50 (citing *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 23; *People v. Branch*, 2018 IL App (1st) 150026, ¶ 34). In the present case, defendant was convicted of aggravated battery, causing great bodily harm to an individual 60 years of age or older, which carried a sentencing range of three to seven years. 720 ILCS 5/12-3.05(a)(4)/(h) (West 2018); 730 ILCS 5/5-4.5-35(a) (West 2018). Thus, his sentence fell within the statutory limits.

¶ 61    As such, on review, "we may alter a sentence only when it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Contursi*, 2019 IL App (1st) 162894, ¶ 23. As the trial court had the opportunity to personally observe the defendant and proceedings, it was in a superior position to determine the appropriate sentence.

*Jones*, 2019 IL App (1st) 170478, ¶ 50. "This court will not substitute its judgment for that of the trial court merely because we would have weighed the sentencing factors differently." *Id.*

¶ 62                                    i. Improper Consideration of Aggravating Factors

¶ 63    Defendant contends that the trial court improperly speculated about defendant's motives and improperly considered defendant's decision to forgo allocution at sentencing.

¶ 64    "[A] trial judge may not consider an improper factor in aggravation when sentencing a defendant because such consideration clearly affects that defendant's fundamental right to liberty." *People v. Brown*, 2019 IL App (5th) 160329, ¶ 18. Our courts have found error where a trial court made a sentencing determination based on its own private investigation or private knowledge, or speculation about facts not in evidence. See *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001) (trial court spoke at length about social science statistics and generalizations about crime the judge had read in a book, which also conflicted with the evidence in the case); *People v. Johnson*, 227 Ill. App. 3d 800, 816-17 (1992) (court's finding that offense was drug-related was not based on the evidence). Additionally, a trial court may not draw negative inferences from a defendant's exercise of his fifth amendment right against self-incrimination. *People v. Maggio*, 2017 IL App (4th) 150287, ¶ 48; *People v. Young*, 2022 IL App (3d) 190015, ¶ 22.

¶ 65    "When we review a sentence for an alleged error based upon the consideration of an improper factor in aggravation, we consider the record as a whole and do not focus merely on a few words or statements from the trial judge." *Brown*, 2019 IL App (5th) 160329, ¶ 18. We consider the trial court's statements as a whole because "[a]n isolated remark made in passing, even though improper, does not necessarily require that [the] defendant be resentenced." (Internal quotation marks omitted.) *Id.* Ultimately, in order to obtain a remand for resentencing, "a

defendant who has alleged error must show more than the mere mentioning of the improper factor in aggravation: the defendant bears the burden of showing that the trial judge relied upon the improper factor in fashioning the defendant's sentence." *Id.*

¶ 66     As we must consider the trial court's statements as a whole, we set them forth below in their entirety:

"This case quite frankly is one of the most disturbing cases that I have presided over as a judge and that's basically been almost 25 years now.

The brutality on an absolutely innocent individual who did nothing to provoke, entice, encourage challenge Mr. McMath in any way, to be just there as nothing but -- like she didn't exist, like she wasn't a living, breathing human being who would suffer pain.

She could not have been more vulnerable. She's sitting there alone looking down, reading. She is using public transportation for the purpose it was intended. And for no explainable reason other than hate and the desire to destroy and hurt and cause permanent physical damage, she brutality, unbelievably punched by the defendant here who sizes up the situation, realizes she's in no position to defend herself nor would she be in any thought process where she might have defended herself.

She is supposed to be safe, you know. She does nothing to entice Mr. McMath other than just sitting there minding her own business, using public transportation when she is punched so hard by such a roundhouse swipe in such a cowardly act because the act is done at the same time the train is pulling into a station so that the doors are going to open up and the person that causes this horrific damage can just flee out the door and then hopefully get

away, hopefully never be apprehended. Apparently, you know, so that if Mr. McMath chose, he could continue to do it again.

The horrific nature of her injury was -- it was difficult for the lady to get up here I know and even read what she had written about what she has endured. It was difficult to listen to it. You know, we complain about minor aches and pains, you know, we get a cold, we get a stomach flu or something like that, oh, we're miserable.

But she is one of the strongest people I've ever seen. To fight back for her own health to be there for others, to demonstrate the kind of courage that you didn't ever demonstrate, punching that lady, running away so that you could get away with it.

You almost—You very likely might have gotten away with it. You know, the Evanston Police Department, they had your photograph as well but they might not have been ever [*sic*] able to have anybody use that photograph in such a way where they could identify who the person was so that they could put it in a showup [*sic*] to see if the attacker at the Dempster stop was the same woman [*sic*].

Fortunately, because of some other activity you engaged in if I'm not mistaken, it was, like, a retired police officer that chased after Mr. McMath as he fled from a store and he was able to hold him so that the police could actually take him into custody and ultimately be held responsible for what he did to Ms. Johnson.

Anyway, I just hope, ma'am, that you never succumb to this horrific act that happened to you and I just hope and pray that you stay strong and you just keep fighting for every day because you deserve it. You earned it. You did nothing other than live a good

life. And I can't explain it. I can't justify it. I can't do anything that can make you the way you were. If I had that power, I would use it.

But the brutality of his act is mind boggling. And then now to learn that the defendant did exactly the same thing to another lady again on the CTA and it's the same cowardly act, the lady is sitting there and the defendant just -- not even on a train just comes up, sees her unprotected, not doing anything to provoke anybody in the world, but he just hauls off and hits her. For her good fortune and sadly Ms. Johnson's bad fortune, he didn't connect at exactly the same angle even though he tried. And that lady was not nearly as severely injured as Ms. Johnson was.

The kinds of injuries Ms. Johnson went through here, the injuries she went through for this punch, you know, it's worse than some of the bullet cases we get, some of the gunshot victims. You know, and it's—I don't know. It seems like both of these attacks again just—it's—they're not explained. I read the presentence investigation. I've listened to the arguments of [defense counsel] and then given the defendant an opportunity to try to perhaps say something and it's his choice, he doesn't have to, I won't hold it against him that he didn't. But I'm not equipped to figure out what was going on that would drive any human being to do this to another human being other than just some sort of hatred.

I mean, it's—this—we hear the term bandied about, you know, Oh, it's a hate crime or something like that. And this sure seems like it was a hate crime to me. Maybe not as defined by statute. But no human being could do this to another person in an unprovoked way like that without having some inner hatred for humanity.

The defendant sadly was—I guess the way the case went was he—he had not been identified for the January attack when Ms. Johnson was the victim."

¶ 67    Defendant argues that the trial court improperly speculated about his motives in committing the attack in mentioning a "hate crime." However, when viewed as a whole, the trial court did not engage in speculation about facts outside the evidence, did not rely on any private knowledge or private investigation, and did not make any type of finding rooted in such when determining defendant's sentence. *Dameron*, 196 Ill. 2d at 171-72; *Johnson*, 227 Ill. App. 3d at 816-17.

¶ 68    The trial court's brief statement about a "hate crime" towards the end of its colloquy is more properly viewed in the context of the trial court's discussion about what the trial evidence and evidence presented at the sentencing had shown, that is, the brutal nature of the attack and the injuries suffered by the victim, and the unprovoked nature of the attack in that the victim was simply riding public transportation, reading a book, and "minding her own business," when the defendant hit her so hard that he destroyed her eyeball and timed the attack so he could flee the train at the next stop. The trial court observed that it was one of the worst cases it had seen. "A trial judge does not operate in a bubble; [he] may take into account [his] own life and experience in ruling on the evidence." *People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007).

¶ 69    The trial court was clearly trying to grapple with the horrific nature of the attack and the fact that defendant inflicted a very similar attack on another victim a few months before, and echoed the State's arguments that this was a "senseless crime." The trial court's comments reflect a consideration not of any improper speculative motives, but of the unprovoked, horrific nature of the offense, the life-long impact on the victim, and the fact that defendant previously perpetrated

another similar attack. A trial court may properly consider the particular nature of the crime in fashioning its sentencing determination. *Harmon*, 2015 IL App (1st) 122345, ¶ 123. Moreover, "evidence of other crimes is admissible at sentencing regardless of whether the defendant was charged with or convicted of the crimes." *People v. Bilski*, 33 Ill. App. 3d 808, 816 (2002). And, in determining the length of a sentence within the statutory range, the trial court may consider the degree of harm caused to a victim. *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986).

¶ 70 With respect to defendant's allegation that the trial court improperly held his silence at sentencing against him, the passage above demonstrates that the trial court did not place any improper reliance on this factor. Indeed, the trial court specifically stated that "it's his choice, he doesn't have to, I won't hold it against him that he didn't" allocute at sentencing. It specifically did not consider defendant's silence as a sign of lack of rehabilitative potential or a lack of remorse. The cases upon which defendant relies are distinguishable from the present circumstances. *Maggio*, 2017 IL App (4th) 150287, ¶ 49 (trial court specifically considered defendant's refusal to answer questions during the pre-sentence investigation as evidence of lack of rehabilitative potential); *People v. Matute*, 2020 IL App (2d) 170786, ¶¶ 56-59 (trial court stated that it was "a bit disturbing" that defendant remained silent at sentencing and it "considered heavily" defendant's lack of remorse).

¶ 71 Accordingly, defendant has not shown that the trial court relied on any improper considerations or that it abused its discretion in sentencing defendant. Defendant has not shown that any clear or obvious error occurred warranting relief. *Hillier*, 237 Ill. 2d at 545.

¶ 72                          ii. Failure to Consider Mitigation Evidence

¶ 73    Defendant next argues that his sentence was an abuse of discretion because the trial court ignored certain evidence in mitigation, namely, (1) that his mental health challenges resulted in the instant offense, and (2) his rehabilitative potential as shown by the fact that he had not committed any new offenses since this one. Defendant argues that the trial court refused to even consider the mitigating factors, instead insisting that the offense had no explicable motive other than hate and did not acknowledge that defendant had increased rehabilitative potential because his mental health issues were going into remission and he had not committed any other offenses.

¶ 74    As previously set forth, during mitigation, defense counsel informed the trial court that two defense experts had found defendant legally insane at the time of the offense, he had been diagnosed with a "bipolar type of schizophrenic disorder," his strange behavior began in 2018 in conjunction with attending a church where some people were a negative influence on him, he began hearing voices and had "preoccupations" which led to the two attacks or "aberrations," and he had not committed any crimes since and had strong family support.

¶ 75    Thus, these factors were plainly before the trial court at sentencing. Although defendant argues on appeal that the trial court simply "ignored" this evidence, the trial court's statements do not support this assertion. When going over the various factors it considered in sentencing defendant, the trial court stated that it had "I read the presentence investigation. I've listened to the arguments of Ms. De Yoe [defense counsel]***."

¶ 76    Even so, the trial court was not required to find that defendant's mental health struggles served as a mitigating factor. A trial court may consider mental health issues as aggravating or mitigating factors, depending "on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness." (Internal quotation marks omitted.)

*People v. Madej*, 177 Ill.2d 116, 139 (1997). Further, although defendant emphasizes his rehabilitative potential by virtue of not committing more offenses while imprisoned, "good behavior in prison need not offset otherwise substantial aggravating evidence against the defendant." *People v. Ballard*, 206 Ill. 2d 151, 189 (2002).

¶ 77    "While the court may not disregard mitigating evidence, it determines the weight of such evidence. *** We presume the court considered all mitigating factors on the record absent an affirmative indication to the contrary." *Contursi*, 2019 IL App (1st) 162894, ¶ 24. This was not a case, contrary to defendant's contention, where the trial court refused to even consider mitigation. See *People v. Calhoun*, 404 Ill. App. 3d 362, 386 (2010) (trial court failed to consider the statutory sentencing factor—whether the defendant acted under a "strong provocation"—in mitigation, where the defendant killed the victim upon learning the victim had sexually assaulted her infant daughter).

¶ 78    Here, there was no affirmative indication that the trial court disregarded or refused to consider these mitigating factors. Rather, the trial court acknowledged that it considered the mitigating factors, but that the other factors in aggravation, such as the nature of the offense and the fact that defendant engaged in two similar attacks within a few months of each other, carried more weight. "The most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense." *Contursi*, 2019 IL App (1st) 162894, ¶ 24.

¶ 79    In summary, defendant has failed to show any abuse of discretion by the trial court in sentencing defendant within the applicable range to seven years' imprisonment. Defendant has not demonstrated that his sentence was greatly at variance with the spirit and purpose of the law or

manifestly disproportionate to the nature of the offense. *Contursi*, 2019 IL App (1st) 162894, ¶ 23. As he has failed to show that any clear or obvious sentencing error occurred, he is not entitled to relief from his procedural default. *Hillier*, 237 Ill. 2d at 545.

¶ 80                                     C. Conviction in Case Number 07 CR 22337

¶ 81     On March 27, 2008, defendant plead guilty to AUUW in violation of 720 ILCS 5/24-1.6(a)(1)/(a)(3)(A) (West 2008) and was sentenced to 35 months' imprisonment. Defendant seeks to have this court vacate that conviction, and the State agrees. Defendant has supplemented the record on appeal with the mittimus and charging instruments in Cook County Case No. 07 CR 223701, which shows that defendant was sentenced to 35 months' imprisonment for AUUW under section 24-1.6(a)(1)/(3)(A). Based on *In re N.G.,* 2018 IL 121939, and *People v. Aguilar*, 2013 IL 112116, we find that defendant's conviction for AUUW under 720 ILCS 5/24-1.6(a)(1)/(a)(3)(A), should be vacated, and we accept the State's concession.

See also *People v. Cross*, 2019 IL App (1st) 162108, ¶ 187.

¶ 82                                     III. CONCLUSION

¶ 83     For the reasons stated, we affirm the judgment of the circuit court of Cook County. In addition, we vacate defendant's conviction for AUUW in Cook County Case No. 07 CR 22337.

¶ 84     Affirmed in part and vacated in part.